579 A.2d 906

**In re ADOPTION OF B.J.R.**

**Appeal of M.R., Natural Mother of B.J.R.,**

**Robert Petrosky, Guardian ad Litem,**

**Armstrong County Children and Youth Services.**

Superior Court of Pennsylvania.

Argued June 25, 1990.

Filed Aug. 14, 1990.

12

---

Bradley K. Hellein, Asst. Dist. Atty., Kittanning, for appellant.

Robert Petrosky, Kittanning, for Robert Petrosky, participating party.

James A. Favero, Kittanning, for Armstrong County Children & Youth Services, participating party.

Before ROWLEY, JOHNSON and HUDOCK, JJ.

ROWLEY, Judge:

This appeal concerns the involuntary termination of the parental rights of appellant, M.R., with respect to her twelve-year-old son, B.J.R.[1] On May 23, 1989, following a hearing, the trial court entered a decree nisi terminating appellant's parental rights. On October 18, 1989, the trial court entered an order denying and dismissing appellant's exceptions and making final the decree nisi. In this timely appeal of the final decree, appellant raises two issues: 1) whether the trial court erred in concluding that appellant's paramour had sexually abused B.J.R.; and 2) whether the trial court erred in concluding that appellant could not, within a reasonable time, cure the circumstances that had required B.J.R.'s placement in foster care. For the reasons set forth below, we affirm the final decree terminating appellant's parental rights.

In a proceeding to terminate parental rights, the party seeking termination must prove by clear and convincing evidence that grounds for termination exist. *In re Adoption of J.J.*, 511 Pa. 590, 594, 515 A.2d 883, 885–86 (1986) [quoting *Matter of Adoption of G.T.M.*, 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984)]. In the present case, termination of appellant's parental rights was sought pursuant to 23 Pa.C.S. § 2511(a)(5), which reads as follows:

The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . . .

**1.** "The [trial] court pleadings contain the child's full name rather than his initials throughout these proceedings. We do not in any way condone the use of the child's name and accordingly have changed the name to initials in the caption and throughout the opinion." *Matter of Adoption of C.A.E.*, 516 Pa. 419, 420 n. 1, 532 A.2d 802, 803 n. 1 (1987).

14

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5). As this Court made clear in *In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522 (1990), an involuntary termination of parental rights pursuant to § 2511(a)(5) requires proof of the five elements specified in the statute:

1) the child has been removed from parental care for at least six months;

2) the conditions which led to the child's removal or placement continue to exist;

3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time;

4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and

5) termination of parental rights would best serve the needs and welfare of the child.

*Id.*, 391 Pa.Superior Ct. at 85, 570 A.2d at 525. The fifth factor, whether termination would best serve the needs and welfare of the child, is not "a mere formality flowing from the existence of the preceding four elements" but is instead "a discrete consideration." *Id.* "A determination that the Parents' incapacity results in an inability to care for the children and that the condition cannot improve over time is alone insufficient to warrant termination under 2511(a)(5)." *Id.*, 391 Pa.Superior Ct. at 91, 570 A.2d at 528. We note, in addition, that § 2511(b) provides that "[t]he court in termi-

nating the rights of a parent shall give primary consideration to the needs and welfare of the child."

Where, as here, the trial court has found that the petitioner's burden of proof has been met and has accordingly terminated the rights of a parent,

> the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal.

*In re Adoption of J.J.,* 511 Pa. at 593–94, 515 A.2d at 885 (quoting *Matter of Adoption of G.T.M.,* 506 Pa. at 46, 483 A.2d at 1356) (citations omitted). Furthermore,

> unless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. The trial court, as trier of fact, is the sole judge of credibility of witnesses. Conflicts in testimony are to be resolved by the trier of fact and we may not disturb a decree of Orphans' Court based upon findings supported by the record unless Orphans' Court applies an incorrect legal standard.

*Id.* 511 Pa. at 594, 515 A.2d at 886 (citations omitted).

Mindful of this scope of review, we turn to the facts of the case before us. B.J.R., who was born on September 30, 1977, is an educable mentally retarded child. Appellant, his natural mother, is also of limited intellectual ability. The parental rights of B.J.R.'s father, one R.B., were also involuntarily terminated by the trial court. R.B., who has had no contact with the child, did not appear in the termination proceedings and has not challenged the termination of his parental rights.

The involvement of Armstrong County Children and Youth Services ("CYS") began in 1981, when services were offered to appellant and B.J.R. in an attempt to address the child's developmental delays. According to Jennifer Hock-

man, the CYS caseworker assigned to the family, B.J.R.'s developmental delays continued and appellant proved unable to meet his special needs, leading CYS to petition in October 1984 to have the child adjudicated dependent. The petition was granted, and B.J.R. was placed in a foster home. At that time the agency's goal was for the child to return home.

In January 1986, as a result of episodes of regressive behavior that appeared to be connected to appellant's visits with him, B.J.R. was placed in the John Merck Program for Multiply Disabled Children at the Western Pennsylvania Psychiatric Institute and Clinic. In April 1986 he was placed in a foster home in Washington, Pennsylvania, operated by the PRYDE program of the Pressley Ridge School, where he continues to reside.[2] The agency's goal for the child was changed to adoption in May 1986 because, as Ms. Heckman explained,

> [B.J.R.] had been in placement for almost two years ... and the agency had observed no major improvement in any of the reasons that [he] had been put in placement to begin with. Due to the fact that we need to plan for permanency for these children and provide them with a home in which they feel secure, stable and know that they will not be removed from we felt it was best to terminate [the] rights of [appellant] and plan for permanency for [B.J.R.].

N.T. at 20.

In January 1987 appellant moved to Westmoreland County. She lives with one T.U. and their daughter, M., who was born in 1984. Services to the family are now provided by the Children's Bureau of Westmoreland County.

On March 17, 1987, CYS of Armstrong County filed a petition to terminate the parental rights of appellant and R.B. with respect to B.J.R. At a hearing on March 24,

---

2. In its opinion accompanying the decree nisi, the trial court indicated that B.J.R.'s first foster home was also connected with the PRYDE program. However, the record indicates otherwise. Ann Grimes Essay, program supervisor at the Pressley Ridge PRYDE Program, testified that B.J.R. entered the program on April 8, 1986.

1988, extensive testimony was taken from persons who had been involved in the provision of services to appellant and B.J.R. Jennifer Heckman, the Armstrong County CYS caseworker, testified that when the agency first became involved, services were provided to B.J.R. through Headstart and United Cerebral Palsy and that appellant was encouraged to attend the CYS parents' training group and a Parents Anonymous group. After B.J.R. was placed in foster care, Ms. Heckman testified, appellant was referred to the Family Counseling Center and the nutrition program offered by the Penn State Extension Service, as well as the Parents Anonymous group and the parent training group. After B.J.R. entered the PRYDE foster home, appellant was also referred to the PRYDE program's natural parents group.

According to Ms. Heckman, the attendance of appellant and T.U. at the counseling center, to which the agency provided transportation when necessary, was sometimes very good and sometimes very sporadic. They attended the Parents Anonymous group "faithfully" (N.T. at 9), but appellant ceased attending the PRYDE natural parents group after CYS changed its goal for B.J.R. to adoption. Ms. Heckman testified that from the time B.J.R. entered placement to the time the family moved from Armstrong County, "[a]ny progress that was observed was very minimal and was subsequently lost at other points in time" (N.T. at 17). She explained further as follows:

Q: Isn't it true that [appellant] generally complies with all of the services ... that are recommended or proposed for her?

A: We have never had a problem, a long standing problem, with [appellant] not attending services that are asked of her. The problem we experienced with her is internalization of the issues, recommendations and treatment fidelities that are used with her.

Q: The problem isn't that she's not interested, the problem is she can't internalize these things?

A: Right.

N.T. at 19. Ms. Heckman, who had been present for the majority of visits between B.J.R. and appellant when the child was in foster care in Armstrong County, stated that "the interaction between the two of them would be very minimal" (N.T. at 12), that on one occasion B.J.R. ran through the halls of the office while appellant stared out the window and appeared unable to control his behavior, and that the visits did not improve over time. Asked why the agency believes that appellant has been unable to remedy the situation that led to B.J.R.'s placement, Ms. Heckman explained that

> the situation which led to the placement was the fact that she was unable to meet his special needs and, you know, the environment in the home was growth inhibiting instead of encouraging him to develop at an appropriate rate of speed, he was losing developmental talks [sic] and her inability to internalize these issues has not led her to be able to inhibit [sic] his growth.

N.T. at 21.

Dr. Martin Fialkov, a specialist in child psychiatry, testified concerning the evaluation of appellant, T.U., and B.J.R. that he conducted on November 14, 1987. Dr. Fialkov described B.J.R. as "a very limited child" (N.T. at 31) who was probably functioning at a three- or four-year-old level or a little higher and who needs parents who understand his potential, as well as considerable support and protection against harming himself or being harmed. With regard to appellant's prospects for improvement, he offered the following opinion:

> My opinion was that ... her ability to acquire the necessary parenting skills, ... in other words her ability to be flexible and make adjustments for the child and to acquire insight to care for this child was extremely unlikely.... I felt in the foreseeable future within the time that the child could benefit from this which would be the next eight years, I didn't feel that she would make sufficient gains to be able to provide for the child because of her own limitations both intellectually in terms of her

parenting knowledge ... which the agency I understand had been attempting to supplement ... so I think that there's resources available in the community and I think all of those have been applied to her and that at the point I saw her, she had not made sufficient progress to convince me that as I said in the foreseeable future where this kid can benefit from it that she would be able to meet his needs.

N.T. at 37. Dr. Fialkov explained that in his opinion appellant's inability to be an effective parent involved not only her intellectual deficits but also "experiences of her own in terms of growing up ... what she experienced in [her] family ... [lack of] adequate schooling, a lot of factors combined to ultimately make her incompetent to parent this child" (N.T. at 48). He also suggested, in reference to appellant's intellectual and psychological limitations, that a child such as B.J.R. "would make very severe demands on [a] very limited resource" (N.T. at 39).

With regard to the interaction between appellant and B.J.R., Dr. Fialkov observed that they evidenced some "tenuous common ground" (N.T. at 29) but basically interacted as polite strangers. He also noted that B.J.R. described an incident of sexual abuse committed against him by T.U., appellant's companion, and that appellant averted her eyes when the child described the incident. Although both appellant and T.U. denied that such an incident had occurred, Dr. Fialkov testified that "I was just struck by a child whose verbal abilities were so limited giving me an unusually frank description of what had occurred and I had assumed that that had made some impression on him" (N.T. at 30).

In his report, which is included in the original record, Dr. Fialkov concluded that T.U. is at high risk for abusive parenting, and he noted that Carol Patterson, a child psychologist who also had evaluated appellant, T.U., and B.J.R., had reached the same conclusion with regard to appellant. With regard to the interaction between appellant and B.J.R., Dr. Fialkov noted in his report that although appellant encouraged B.J.R. to hug and kiss her, which he

did, and they appeared to have a bond with something in common to discuss, the bond was rather limited and not sufficient to sustain conversation for more than a few minutes. Dr. Fialkov concluded that B.J.R.'s residual ties with appellant were not enough to sustain the mother-child relationship, although he also expressed concern about the child's adoptability.

Ms. Patterson, the child psychologist, testified that

I felt that [appellant] had many difficulties that would preclude her from being able to parent. Some of them are interpersonal difficulties, emotional instability, a lack of parenting skills, an intelligence functioning within the border line range of ability, past physical and sexual abuse conducted by her parents when she was growing up, her past abuse of alcohol substance, and her passive rather dependent personality makeup that makes her dependent upon others for really everyday support in her current living arrangements.

N.T. at 55. Ms. Patterson explained that B.J.R.'s problems "will not get better per se" as he grows older, but rather that they will change and he will continue to require "consistent structured parenting" (N.T. at 68). She testified that she considered T.U. to be at high risk for child abuse, and in her report, as noted earlier, she said the same of appellant. In her report Ms. Patterson also observed, *inter alia*, that, based on appellant's responses to a parenting inventory test, appellant "does not have appropriate developmental expectations for children," "lacks an understanding of normal child growth and development," "lacks empathy for children," "believes in corporal punishment . . . and lacks knowledge of alternatives to corporal punishment," and "may reverse family roles in that she may tend to use children to meet her needs . . ." (Psychological Evaluation of M.R. at 4). In her report Ms. Patterson also noted B.J.R.'s statement that he enjoys visiting with appellant, as well as his foster mother's observation that he shows no ill effects after the visits. However, Ms. Patterson concluded that B.J.R. feels himself an integrated part of his foster

family and tends to perceive them as his family and as his primary caretakers.

Judith Logan, a caseworker for the Westmoreland County Children's Bureau who has been assigned to appellant's family since January 1987, testified that M., the daughter of appellant and T.U., exhibited some slight developmental delays, that "there are ... concerns ... that there isn't enough interaction between [M.] and her parents to upgrade her skills" (N.T. at 74), and that "there is a possibility that [M.'s] parents are not following through with the recommendations of the United Cerebral Palsy to do ... the daily re-enforcement of what they're trying to accomplish at the preschool" (N.T. at 75). She conceded that M. was appropriately fed, appellant's home was acceptably clean, there had been no founded allegations of abuse or neglect, she had not observed any problems with discipline or the lack thereof, and the Children's Bureau was not contemplating a dependency action on behalf of M. It was her opinion, however, that because B.J.R. is a special needs child, he would not receive the care that he requires in appellant's home.

Ann Grimes Essay, a program supervisor at the Pressley Ridge PRYDE Program, testified that B.J.R. had made steady progress in intellectual and motor skills since his placement in the PRYDE foster home. She explained that one of the main reasons that appellant no longer attended the natural parents' group, which meets in Pittsburgh, was her difficulty in arranging transportation, but in addition she "[r]eally doesn't seem to have an interest in it" (N.T. at 83). Ms. Essay described the interaction between appellant and B.J.R. during appellant's visits as "positive" but "very minimal" (N.T. at 84). Surface comments are passed back and forth between them for the first five or ten minutes, she explained, and for the remainder of the visit B.J.R. plays with M. or the two of them play with his foster brothers and sisters. Ms. Essay noted that B.J.R. has asked that his foster mother be present during his visits with appellant.

Daffney Roofner, a caseworker at the Armstrong County Family Counseling Center, testified concerning the services provided to appellant from May of 1985 to January of 1987. She explained that appellant came to the Center twice a month, an in-home worker went to appellant's home once a week, and appellant's attendance was good. However, she also stated that she and appellant would agree on a goal to be met, such as having appellant bring her daughter to the Center dressed in clean, appropriate clothing and with two toys, and "[s]he would have temporary success in meeting a goal, but as you move on to the next one if there was not re-enforcement of the original goal, that would be lost" (N.T. at 89), and thus they would be required to "go backwards or simplify the first goal" (N.T. at 90). Asked whether appellant's abilities improved over time, Ms. Roofner replied that "[t]here would be times when there would be improvement, although that seemed to have deteriorated towards the end ..." (N.T. at 90). She also testified that on appellant's last visit before leaving Armstrong County, M. was dirty and not appropriately dressed for the winter weather. Ms. Roofner stated that she and appellant discussed B.J.R. only in general terms because they could not get beyond the basic needs of M., the child who was in appellant's care.

Finally, the court heard the testimony of appellant and T.U. Appellant stated that she thought her progress had improved since she began meeting with the caseworkers, that she had learned such things as preparing nutritious meals, the need to work with M. on colors and drawing, and methods of discipline for B.J.R. such as "time out," i.e., "[s]it him in a chair and don't hit him and tell him what he did wrong ..." (N.T. at 102). She testified that she considered herself able to care for both of her children and that she would be able to gain the skills necessary to take care of B.J.R. "if I don't have nobody bugging me about it ..." (N.T. at 100). Although appellant stated that she would continue to work with CYS if B.J.R. were returned to her home, she also expressed resentment at the presence of

caseworkers "twenty-four hours a day" (N.T. at 107) and suggested that they were not trying to help her but instead "they wanted M." (N.T. at 108). Appellant acknowledged that B.J.R. was somewhat limited because "he's slow" but also expressed the belief that he might "[b]e a president some day" (N.T. at 108). She testified that B.J.R. talks about M. and vice versa and that during visits he suggests playing with her (appellant) and M. and wants to talk about what has been going on at home. In his testimony, T.U. denied that the sexual abuse described by B.J.R. had occurred.

In the opinion accompanying the decree nisi of May 23, 1989, the trial court expressed concern about appellant's own history as an abused child and her high potential for being an abusive parent, combined with the fact that B.J.R. had been sexually abused by T.U., with whom appellant continues to reside "despite her apparent knowledge of incident(s) of his sexual abuse of this child" (Trial Court Opinion at 7).[3] With regard to appellant's parenting skills, the court observed that

> [d]espite the rather diligent efforts of [appellant] to attend and participate in at least some of the programs offered to her, the evidence shows that she has been unable to gain true insight and understanding with regard to her son's disabilities. Importantly, she has been unable to acquire and assimilate the knowledge and skills necessary in order to provide the day-to-day care and supervision which her son requires now and will acquire [sic] into the foreseeable future.

Trial Court Opinion at 7. While acknowledging appellant's interest and concern, the court found her assessment of her present ability to provide adequate care for her son to be "quite unrealistic" (Trial Court Opinion at 8). In sum, the court observed, "[t]he conclusion seems inescapable that this mother cannot now or in the relevant future provide suitable and adequate care for the child so as to remedy the

---

**3.** We do not know the basis for the trial court's implication that there may have been more than one incident of sexual abuse.

condition which led to his removal from her home despite the fact that all services reasonably available were provided or offered to her in an effort to achieve such a remedy" (Trial Court Opinion at 8–9). Termination of appellant's parental rights would best serve the child's needs and welfare, the court held, adding that

> [o]ur conclusion is buttressed by the facts, noted by several witnesses, that the child seems to have only a loose bond with the mother; that the child seemed to regress in behavior following visits with the mother[4]; that the mother failed/refused to protect him from sexual abuse in the home and failed/refused to take necessary steps to preclude recurrence of sexual abuse even after she had clear knowledge of its original occurrence; and that the alleged perpetrator of the sexual abuse (the mother's paramour) continues to reside in her home and has not completed any course of counseling or treatment.

Trial Court Opinion at 9–10. The court concluded that CYS had met its burden of establishing by clear and convincing evidence that appellant's parental rights should be terminated.

In the opinion accompanying the final decree of October 18, 1989, the court acknowledged that appellant had attended the majority of programs offered to her and had made some progress, but held that "there was ample evidence presented to demonstrate that though [appellant] attends the class sessions and meetings, she is unable to internalize and/or utilize in practice the information given her" (Trial Court Opinion at 2). The court also noted that the same result would be reached even if the allegation of sexual abuse were disregarded.

In this appeal, both CYS and the guardian ad litem appointed to represent B.J.R. assert that the trial court's conclusions are amply supported by the evidence of record. Appellant, on the other hand, contends that the trial court

4. This observation by the trial court apparently refers to B.J.R.'s behavior prior to his placement in the PRYDE foster home. Carol Patterson stated in her report that B.J.R.'s present foster mother noticed no ill effects after his visits with appellant.

relied almost exclusively on the testimony of Dr. Fialkov and Ms. Patterson and that their analysis was "at best superficial and at worst completely subjective" (Brief for Appellant at 9). She also maintains that she loves her son and he loves her, that "where a parent continues to try to retain her relationship with her son even though it is hard for her to succeed, the Court should not interfere with the mother/child bond" (Brief for Appellant at 9), and that although she may be less than a perfect mother, the court erred in terminating her parental rights.

█ We are confronted in this case with the difficult situation of a parent whose desire to provide adequate care for her child is evident, but whose ability to do so is in doubt. Our Supreme Court, interpreting the legislature's enactment of the Adoption Act of 1970, has held that a parent who is incapable of performing parental duties is equally as unfit as one who is unwilling to do so. *In re Adoption of J.J.*, 511 Pa. at 605, 515 A.2d at 891 [quoting *In re William L.*, 477 Pa. 322, 345, 383 A.2d 1228, 1239 (1978), *cert. denied sub nom. Beatty v. Lycoming County Children's Services*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978) ]. Accordingly, proceedings to terminate the parental rights of mentally or physically impaired parents do not require the application of a more stringent "beyond a reasonable doubt" burden of proof. *Id.* 511 Pa. at 607, 515 A.2d at 892. "What is important is the demonstrated willingness and ability of the parent to perform, at a minimal level, his or her parental duties." *Id.*, 511 Pa. at 608, 515 A.2d at 893.

█ Having reviewed the evidence of record, including the hearing transcript and the reports of Dr. Fialkov and Ms. Patterson, as well as the briefs and arguments of the parties, we conclude that the trial court's adjudication should be affirmed. We reach this conclusion with some reluctance, as it is apparent that appellant has exerted considerable effort in an attempt to become a better parent. Nevertheless, the record before us indicates that appellant's efforts, at least with respect to B.J.R., have been and would

continue to be unsuccessful. Daffney Roofner, the Family Counseling Center caseworker, testified that appellant was unable to retain what she had learned without constant reinforcement, making it impossible for appellant and Ms. Roofner to move beyond M.'s basic needs to a consideration of the requirements of caring for B.J.R. Ms. Roofner's estimate of appellant's abilities echoed that of Jennifer Heckman, the CYS caseworker, who testified that the minimal progress made by appellant "was subsequently lost at other points in time" because appellant was unable to internalize the parenting skills that were taught to her. Appellant's difficulty in learning and retaining parenting skills is compounded by her inability, as noted not only in the psychiatric and psychological evaluations but also in the trial court's evaluation of appellant's testimony, to understand B.J.R.'s needs and limitations. Appellant's evident mistrust of the motives of the caseworkers who keep "bugging" her is further evidence that she is unlikely to make greater progress in the foreseeable future.

We emphasize that this is not a case in which only half-hearted attempts have been made to assist a parent of limited intellectual ability in gaining the necessary child-rearing skills. *Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982). To the contrary, it is a case in which numerous services have been provided to appellant for a number of years, with little or no change in her ability to provide the "consistent structured parenting" required by B.J.R. Of considerable significance is the fact that none of the witnesses who testified at the hearing, other than appellant herself, offered any hope that appellant would be able to acquire the ability to care for B.J.R. within a reasonable period of time. Our Supreme Court has held that where a parent's own testimony was the only evidence that she would be capable of caring for her child, and the trial court obviously regarded the parent's testimony as incredible, this Court erred in finding that the parent had the potential to develop the necessary parenting skills and reversing the termination decree on that basis. *Matter of*

*Adoption of C.A.E.*, 516 Pa. 419, 424, 532 A.2d 802, 805 (1987). *See also In re Adoption of T.M.*, 389 Pa.Super. 303, 566 A.2d 1256 (1989) (where outcome of parent's drug addiction treatment was problematical, and caseworker and psychologist testified that parent had not remedied the conditions that led to child's placement, termination of parental rights was justified); *In re Quick*, 384 Pa.Super. 412, 559 A.2d 42 (1989) (where appropriate treatment would require several years of intensive therapy, parent had not availed herself of treatment, and there is substantial likelihood treatment would be unsuccessful, termination of parental rights was justified).

We note also, with reference to the fifth factor enumerated in 23 Pa.C.S. § 2511(a)(5), that in its decree nisi the trial court concluded that B.J.R.'s needs and welfare would best be served by the termination of parental rights. The phrase "needs and welfare" denotes not only physical requirements such as food, clothing, and shelter, but also the intangible factor of parental love, thus requiring the court to examine the nature of the parent-child relationship. *In re P.A.B.*, 391 Pa.Super. at 85, 570 A.2d at 525.

> That the child has already been removed from the home, as is always the case in a termination proceeding instituted under 2511(a)(5), does not in itself mean that a beneficial parent-child bond does not exist. This fact alone cannot be dispositive of whether termination best serves the child's needs and welfare. Thus, to apply the statute correctly, there must be an inquiry into the status of the bond, regardless of whether the parents have a physical or mental incapacity.

*Id.*, 391 Pa.Superior Ct. at 86, 87, 570 A.2d at 526. Because "[t]he bond with parents is unique and irreplaceable, ... preservation of family ties [is] prima facie in the best interests of the child." *Id.*, 391 Pa.Superior Ct. at 86, 570 A.2d at 522. In *In re P.A.B.*, the record revealed that a beneficial and loving bond existed between the mentally handicapped parents and their three children and that the only suggestion of alternative permanent situations for the children was a statement indicating that one of the children might possibly be adopted by her foster parents. *Id.*, 391

Pa.Superior Ct. at 90, 570 A.2d at 528. This Court concluded that termination of parental rights would be detrimental to the needs and welfare of the children "not only because it would sever an important existing parent-child bond, but also because nothing will take the place of this bond." *Id.*

In the present case, as noted earlier, the trial court found that "the child seems to have only a loose bond with the mother" (Trial Court Opinion at 9). Our review of the pertinent evidence confirms this finding. At the same time, we note that there is nothing in the record to indicate that an adoption is pending for B.J.R. Accordingly, while this case resembles *In re P.A.B.* in at least one respect, the absence of an identified adoptive family, it differs from *In re P.A.B.* in another respect, the strength of the parent-child bond.

■ This difference is, in our opinion, crucial to the outcome of the case. While this Court has acknowledged the importance of preserving a beneficial parent-child relationship, it has also recognized that the state should not "seek to preserve in law a relationship which no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions." *In re P.A.B.*, 391 Pa.Super. at 88, 570 A.2d at 526 (quoting *In re William L.*, 477 Pa. at 348–49, 383 A.2d at 1241). We consider it reasonable to assume that as B.J.R. continues to live with and depend upon his foster family, his relationship with appellant, already tenuous, will become even more so, and that as he grows older, his "adoptability" will diminish. These factors argue in favor of termination so that a permanent plan for the child's future can be devised. Although the record offers no indication that CYS has found a prospective adoptive family for B.J.R., this fact does not serve to bar the involuntary termination of parental rights where such termination is otherwise warranted, inasmuch as 23 Pa.C.S. § 2512(b) provides that an agency bringing a petition for involuntary termination "shall not be required to aver that an adoption

is presently contemplated nor that a person with a present intention to adopt exists." *See also In re P.A.B.* (agency may bring termination petition even though adoption is not imminent).

As noted earlier, we may not disturb the trial court's decree if the findings upon which it is based are supported by the record and a correct legal standard was applied. In the present case, the trial court found that appellant is unable to remedy, within a reasonable period of time, the conditions that led to B.J.R.'s removal from her home and, in addition, that there is only a "loose" bond between appellant and B.J.R. In light of these findings, which are supported by the evidence of record, we conclude, as did the trial court, that CYS has met its burden of proving by clear and convincing evidence that the child's needs and welfare will best be served by the termination of appellant's parental rights.[5] Accordingly, the final decree terminating appellant's parental rights with respect to B.J.R. is affirmed.

Decree affirmed.

---

**5.** In reaching this conclusion, we have disregarded the allegation that B.J.R. was sexually abused by appellant's paramour. Therefore, we do not address appellant's objection to the trial court's consideration of the sexual abuse allegation.