**In the Interest of A.P.**

**Appeal of J.P., Natural Father of A.P.**

Superior Court of Pennsylvania.

Submitted Feb. 13, 1997.

April 10, 1997.

Thomas H. Purl, III, Philadelphia, for Appellant.

William W. Norvell, III, Assistant Public Defender, Philadelphia, for Appellee.

Joseph V. Furlong, Jr., Philadelphia, for E.K., participating party.

Before CIRILLO, President Judge Emeritus, and JOHNSON and OLSZEWSKI, JJ.

OLSZEWSKI, Judge:

This is an appeal from the decree of the Court of Common Pleas of Philadelphia County, Family Division, involuntarily terminating appellant's parental rights to his minor daughter. We affirm.

On March 3, 1990, A.P. was born to E.P. (mother) and J.P. (father), appellant herein.[1] At the time, both of the parents were juveniles and were unable to provide continuous care for the child. As a result, A.P. resided with her maternal grandparents, who were able to provide a stable and nurturing environment for her. Although both parents had contact with A.P., mother moved quite frequently, occasionally living with her parents and the child. Appellant, J.P., briefly resided with E.P. before A.P.'s birth, but never resided with E.P. or the child thereafter.

In February of 1992, A.P.'s maternal grandparents filed an emergency petition seeking custody of A.P. Although temporary custody was awarded to the grandparents, their effort to gain permanent custody was encumbered by a joint counterclaim filed in April of 1992 by mother and appellant.

On January 1, 1993, prior to a final custody disposition, appellant was arrested and, subsequently, convicted of third-degree murder. In November of 1993, after being moved several times throughout our state prison system, appellant was incarcerated at SCI Waymart, in Northeastern Pennsylvania.[2]

In the spring of 1995, mother visited appellant in prison and attempted to have him sign a consent form to permit her parents to adopt A.P. Mother had already signed a consent form. Appellant refused, and an involuntary termination hearing was scheduled for January 4, 1996, in Philadelphia.

Instead of attempting to secure appellant's presence at the hearing, the court employed a method by which appellant participated at the hearing through a telephone conference call. Citing past difficulties with arranging prisoners' transportation, such as delay and lack of resources, the court stated that it believed that the best interests of the child would be served by a quick resolution of the custody question.

Recognizing appellant's interest in the proceedings, however, the court employed the following safeguards: (1) appellant was appointed counsel in advance of the hearing; (2) counsel met with appellant in advance at SCI Waymart to discuss the impending hearing; (3) on the date of the hearing, appellant was able to hear, and be heard, at the proceeding by way of a telephone conference call; and, (4) after each witness testified on direct examination, appellant was able to speak privately with his attorney.

On the day of the hearing, appellant protested that he had a right to attend the hearing in person. Nonetheless, the hearing proceeded as scheduled. Testimony was taken from mother, appellant, and the maternal

---

1. The record in the instant matter, including the trial court opinion, contains A.P.'s full name rather than her initials. We believe that it is in the best interest of the child to preserve her anonymity by identifying her by initials only, and, accordingly, have changed both her and her parent's names. *See In re Adoption of B.J.R.*, 397 Pa.Super. 11, 12–14, 579 A.2d 906, 907.

2. Although we are not in possession of appellant's record, we note that the trial court indicated that appellant received a sentence of five to ten years' incarceration for the murder conviction.

grandparents. On August 13, 1996, Judge Esther Sylvester ordered and decreed that appellant's parental rights to A.P. were terminated and that permanent custody of A.P. was awarded to the maternal grandparents. This appeal follows.

In challenging the decree terminating his parental rights, appellant raises the following issues: (1) whether the procedures adopted by the trial court violated appellant's sixth amendment right to confront witnesses; (2) whether the procedures adopted by the trial court violated appellant's fourteenth amendment right to due process;[3] (3) whether the procedures adopted by the trial court violated attorney/client confidentiality privileges; and, (4) whether the trial court erred in determining that appellant's parental rights should be terminated.

■ Initially, appellant argues that his sixth amendment right to confront witnesses against him was violated because he was not allowed to be physically present at the termination hearing. We find that appellant is misguided in hinging this argument upon the sixth amendment, for it is well-settled that "constitutional rights in a termination proceeding are not derived from the sixth amendment; rather, they are derived from the due process clause of the fourteenth amendment." *In re V.E.*, 417 Pa.Super. 68, 81, 611 A.2d 1267, 1274 (1992) (emphasis original); *see also In re Adoption of T.M.F.*, 392 Pa.Super. 598, 609–10, 573 A.2d 1035, 1041 (1990). The rationale for this is that the sixth amendment affords protections to the criminal defendant and seeks to ensure fairness in criminal proceedings. A termination of parental rights hearing, however, is a civil action, thus making sixth amendment guarantees inapplicable. *Id.*

■ Next, for the same reasons as stated above, appellant avers that his fourteenth amendment right to due process was violated. After careful consideration, we find that appellant's due process rights were not compromised and we therefore affirm the order of the trial court.

■ The fourteenth amendment provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In assessing whether one has been unlawfully deprived of a protected right, a two-part inquiry must be undertaken.

As a threshold, it must be established that the claimed right is guaranteed protection under the fourteenth amendment. That is, that the state has deprived an individual of a liberty or property interest within the meaning of the fourteenth amendment.

Once this has been established, a determination must be made regarding the adequacy of the procedures employed by the state to deprive a person of that right. In essence, a determination must be made as to what minimal protections are mandated and whether the state's actions rose to that level of minimal protection. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■ In the instant matter, it cannot be questioned that the right in question is a liberty interest protected by the fourteenth amendment. Indeed, the Supreme Court has explicitly held that natural parents have a "fundamental liberty interest ... in the care, custody, and management of their child[ren]." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982). *See also Ken R. on Behalf of C.R. v. Arthur Z.*, 546 Pa. 49, 56, 682 A.2d 1267, 1271 (1996); *Cardamone v. Elshoff*, 442 Pa.Super. 263, 274–76, 659 A.2d 575, 581 (1995) (biological parents have a *prima facie* right to custody).

This is not to say, however, that the state may never deprive an individual of the parental right to custody. Rather, this determination fulfills the threshold inquiry only, and allows a court to consider the fairness of the procedures implemented to terminate the parent's right.

■ When making this determination, we are guided by the seminal case of *Mathews v.*

---

3. Although appellant has meshed the sixth and fourteenth amendment inquiries into one issue in his argument, we find that they are best addressed separately. As such, we have severed the issues for purposes of discussion and disposition.

*Eldridge, supra,* wherein the United States Supreme Court held that in considering what process is due in a given situation, three factors must be assessed. First, a court must consider the private interest that will be affected by the state's action. Second, the court must consider the risk of erroneous deprivation posed by the procedures employed and the probable value, if any, that additional or substitute procedures would provide. Lastly, the governmental interest must be reviewed, including any administrative and fiscal burdens that alternate procedures would generate. *Mathews,* 424 U.S. at 334–35, 96 S.Ct. at 902–03, 47 L.Ed.2d at 33. *See also R. v. Com. Dept. of Public Welfare,* 535 Pa. 440, 448–50, 636 A.2d 142, 146 (1994) (adopting the *Mathews* analysis for due process claims brought under § 1, Art. 1 of the Pennsylvania constitution).

With respect to the private interest affected in the instant matter, we can readily state that the right to care, custody, and management of one's children is of the utmost importance. As the Supreme Court has held, the termination of parental rights involves a "unique kind of deprivation" and necessitates a finding that the private parental interest is "commanding." *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640, 650 (1981). *See also M.L.B. v. S.L.J.,* — U.S. —, —, 117 S.Ct. 555, —, 136 L.Ed.2d 473, 495 (1996) ("parental termination decrees are among the most severe forms of state action").

Having detailed the importance of the private interest affected by the state's action, we must now consider the risk of an erroneous deprivation posed by the procedures employed and the probable value, if any, that additional or substitute procedures would provide.

As stated, the procedure fashioned by the trial court in the instant matter was to allow the incarcerated parent to be telephonically, but not physically, present. By way of a conference call, appellant was able to hear the testimony presented, testify in his own behalf, and confer confidentially with his counsel.

In assessing whether this procedure adequately ensured appellant the right to be heard at a meaningful time and in a meaningful manner, as required by *Mathews,* we find guidance from the recent Superior Court case of *In re Adoption of Dale A., II,* 453 Pa.Super. 106, 683 A.2d 297 (1996), wherein a panel of this Court held that an incarcerated parent's right to due process is not violated merely because he or she is not able to attend the termination hearing. Rather, the more important question is whether the procedure offered or employed adequately served to convey the parent's testimony regarding the proposed termination.

As in the present case, the appellant in *Dale A.* was an incarcerated father who had his parental rights terminated following a hearing at which he was not present. Instead of attending the hearing in person, appellant presented his testimony by way of interrogatories brought to the court by his attorney. As this Court noted, appellant could also have presented evidence by way of telephone, deposition, videotape, or otherwise.

In appealing the order of the lower court, appellant claimed that "the orphan's court violated his constitutional rights by not ensuring his attendance at the hearings." *Dale A.,* 453 Pa.Super. at 110, 683 A.2d at 299. Employing the three-part *Mathews* analysis, we held that it was not a violation of due process to allow appellant to present his testimony by a medium other than actual physical attendance at the hearing.

Rather, after noting that "due process is flexible and calls for such procedural protections as the situation demands" we held that the trial court procedure "best conserves the Common-wealth's resources without increasing the risk of erroneous deprivation." *Dale A.,* 453 Pa.Super. at 113–14, 683 A.2d at 300–01 (citing *Mathews, supra,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (citation omitted)).

Applying this analysis to the instant case, we find that appellant was afforded a constitutionally adequate means by which to convey his testimony to the court. Our review of the proceedings below reveals that the procedure did not create a risk that appel-

lant's parental rights would be erroneously or capriciously terminated. Rather, the record demonstrates that the trial judge took pains to protect appellant's rights and considered his testimony with as much thoughtfulness and earnestness as the witnesses who were physically present.

We find the present situation to be factually analogous to that in *Dale A.,* and, based upon the precedent enunciated therein, we hold that the termination procedure employed by the lower court properly balanced the competing interests of appellant and the state while at the same time ensuring that appellant's rights were safeguarded. The procedure, therefore, was not violative of appellant's due process rights.

■ In his third issue, appellant claims that the procedures employed by the trial court with respect to the telephone conference call may have violated attorney/client confidentiality. Because this issue is not properly before this Court, we decline to address its merits.

It is well settled that this Court may not render advisory opinions. That is, absent extraordinary circumstances, an actual case or controversy must exist throughout the proceedings in order for this Court to retain jurisdiction over the matter. *See, e.g., Jefferson Bank v. Newton Associates,* 454 Pa.Super. 654, ——, 686 A.2d 834, 837 (1996); *Erie Ins. Exchange v. Claypoole,* 449 Pa.Super. 142, 148–52, 673 A.2d 348, 352–53 (1996). The instant issue presents this Court with a purely hypothetical factual scenario from which to draw a legal conclusion. Specifically, appellant claims that "it is probable that the inmate was in the presence of the counselor or some other state official," during the times when appellant was conferring with his attorney during the hearing. Appellant's brief at 12 (emphasis added).[4]

We note that the question of whether a state official was impermissibly eavesdropping on a confidential communication would present a justiciable issue for our review. Such is not the present case, however.

Appellant's argument that it is probable or possible, but not certain, that a state official was present is fatal to his presentation of this issue because it would require this Court to answer an abstract, rather than a concrete, legal question. We therefore decline to address the merits of this issue.

Lastly, appellant claims that the trial court erred in finding that clear and convincing evidence was presented to show that his parental rights should be terminated. Having determined that the procedure below adequately protected appellant's procedural due process rights, we will now review the substance of the proceedings.

■ In matters involving termination of parental rights, our review is limited to a determination of whether the findings of the lower court are supported by competent evidence. *See, e.g., In re Adoption of Dale A., II,* 453 Pa.Super. at 109–11, 683 A.2d at 299. This involves a consideration of whether the party seeking to involuntarily terminate one's parental rights proved by clear and convincing evidence that the grounds for doing so existed. If so, it is not for this Court to substitute its judgment for the lower court merely because the record could support contradictory conclusions. *Id.*

■ Presently, the termination proceeding was initiated pursuant to 23 Pa.C.S.A. § 2511(a)(1), which provides:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or had refused or failed to perform parental duties.

■ We note that the instant petition was filed on May 31, 1995, and that, although

---

4. We find it difficult to understand why appellant's claim is couched in such theoretical language. Surely, if anyone knows whether a state

official was present during confidential attorney/client conferences, it is appellant himself.

relevant testimony was elicited concerning the parties' entire five-year relationship, it is the six months immediately preceding the filing of the petition which is most critical to our analysis. This is not to say, however, that a court cannot or should not consider the whole history of a given case. Indeed, we have specifically held that the six-month time period is not to be applied mechanically and that a court must instead consider the individual circumstances of each case. *See, e.g., In Re K.C.W., K.O.W. and K.S.W.,* No. 2714 Philadelphia 1996 (Pa.Super., filed 2/5/97); *Adoption of M.S.,* 445 Pa.Super. 177, 664 A.2d 1370 (1995).

Moreover, while the fact that a parent is incarcerated may make it more difficult to parent in a traditional fashion, the fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond. *See, e.g., In re V.E.,* 417 Pa.Super. 68, 74–76, 611 A.2d 1267, 1271 (1992). As we have previously held, "a parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children." *Id.* at 76–77, 611 A.2d at 1271–72.

With this in mind, the testimony at the hearing established that, from A.P.'s birth in March of 1990 until the emergency hearing in February of 1992 at which the maternal grandparents were awarded temporary custody, appellant visited with A.P. only sporadically. Although appellant knew that the child resided with her maternal grandparents, and had visited the house once before A.P.'s birth, he admitted that he only visited with A.P. once at the grandparents' home. Instead, appellant testified, he preferred to wait until the child's mother arranged for visits because appellant did not feel welcome in the grandparents' home. Additionally, appellant stated that he called the grandparents' home from time to time and was either disconnected or told that the child was not there.

During this same time period, the parties agree that appellant gave one $25.00 money order to A.P.'s mother for the child's support. Additionally, appellant gave the child a stuffed animal and one birthday card. Again, appellant disputed this testimony, and claimed that other periodic support payments were made in cash.

Following his arrest in January of 1993, appellant had no contact with A.P. until November of that year, at which time he was permanently placed at SCI Waymart. Appellant testified that the lapse was caused by the fact that he was moved several times within the state institutional system during this period.

Thereafter, there was considerable dispute as to the amount of contact that appellant had, or attempted to have, with A.P. Mother admitted that appellant sent two gifts to her for the child that mother either returned or threw away. The first present was a painting of a teddy bear with a handwritten message that appellant included for A.P. in a letter sent to mother at her work address. Mother admitted that she threw away the gift and did not tell anyone else about receiving it. The next attempted contact occurred in March of 1995, when appellant sent a birthday card to A.P. at the grandparents' address. This card was opened by mother, defaced, and returned to appellant.

Appellant testified on both direct and cross examination that he attempted many times to contact his daughter and that the two occasions admitted by mother were merely illustrative. For example, appellant claimed that he sent a number of cards, letters and small gifts for A.P. to mother's work address. He testified that the only present returned to him was the March 1995 birthday card, and that he assumed that the others were relayed to the child. Additionally, appellant testified that he made several collect phone calls from prison to the grandparents' home which were not accepted. All of these purported attempts were contradicted by testimony from either mother or the grandparents.

In April or May of 1995, after receiving and returning the March 1995 birthday card, mother visited appellant in prison. At that time, she attempted to have appellant sign papers voluntarily relinquishing his parental rights. Initially, mother lied to appellant and told him that her fiancee wanted to

adopt A.P. after their impending marriage. Eventually, however, mother admitted that she had already signed the necessary paperwork to relinquish her parental rights and permit her parents to adopt A.P. Appellant refused to sign the papers, and shortly thereafter, on May 31, 1995, the involuntary petition to terminate appellant's parental rights was filed.

After receiving and evaluating this evidence, Judge Sylvester concluded that the prospective adoptive grandparents had proven by clear and convincing evidence that appellant failed to perform his parental duties. The court supported its finding by the fact that appellant admitted: (1) having no contact whatsoever with the child for the first nine months of his incarceration prior to arriving at SCI Waymart; and (2) sending one card and one gift in the two and one-half years from his placement at SCI Waymart until the petition was filed.

Addressing the post-abandonment contacts, the lower court cited this Court's holding in *In re Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988), in which we stated:

> To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*Id.* at 282, 549 A.2d at 1295.

The lower court concluded that appellant's post-abandonment contacts were "passive" and that appellant had not demonstrated the type of serious intent to be a parental figure to A.P. contemplated in *Hamilton*. Thereafter, the court stated that the best interests of the child would be served by allowing her maternal grandparents, who had raised and cared for her since birth, to adopt her.

Applying our narrow scope of review, we cannot say that the lower court abused its discretion or that its findings were not supported by competent evidence.

Decree affirmed.