J-S64001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.B.M. A/K/A H.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.F.M., FATHER | : : : : : : | |
| | : | No. 1451 EDA 2018 |

Appeal from the Order Entered April 17, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000780-2016,
CP-51-DP-0001845-2011, FID: 51-FN-003665-2011

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 14, 2018**

W.F.M. ("Father") appeals from the trial court decree entered on April 17, 2018, that granted the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his daughter, H.B.M.  He also appeals the concomitant juvenile court order that changed H.B.M.'s permanency goal from reunification to adoption.[1]  We affirm.

---

[1] Father filed a single notice of appeal from the termination decree and the goal change order.  However, the correct procedure is to file a separate notice of appeal for each docket.  **See** Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Recently, the Pennsylvania Supreme Court held that the failure to file separate notices of appeal from an order resolving issues on more than one docket requires the quashal of the appeal.  **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018).  However, this holding applies only to future cases.  **Id**.  As Father filed his notice prior to the filing of the Supreme Court's decision in **Walker**, we do not quash his appeal.

We adopt the following statement of facts from the trial court opinion, which is supported by the record. H.B.M., born in January 2003, was diagnosed with hypotonic cerebral palsy and Sotos Syndrome, a genetic disorder characterized by a distinctive facial appearance, overgrowth in childhood, delayed development, and learning disabilities. Due to her diagnoses, H.B.M. is non-verbal, and although she is ambulatory, she utilizes a wheelchair. The child requires dedicated medical care and cannot perform basic functions such as cleaning and feeding herself without assistance. Father is legally blind and requires Mother's assistance. D.M.B. ("Mother") has an intellectual disability.[2]

The family came to the attention of DHS in August 2011, after in-home protective services were implemented to monitor H.B.M.'s care and supervision. Upon DHS's intervention, the agency discovered that Mother had a history of transience, the family interfered with H.B.M.'s services, and Mother and Father neglected to ensure that H.B.M. consistently received physical and occupational therapy for her developmental delays.

In September 2011, the family became homeless. Although Mother initially informed DHS that she intended to move H.B.M. into the home of the paternal grandfather, neither parent provided DHS with an address or telephone number to contact the child. Father was belligerent and

---

[2] The trial court also terminated Mother's parental rights to H.B.M. We address Mother's appeal separately.

uncooperative, and he refused to disclose information regarding any relatives or friends who were willing to care for his daughter.

On September 20, 2011, DHS obtained an order of protective custody ("OPC") for H.B.M. and placed her in a medical institution. Following a shelter care hearing, the OPC was lifted and H.B.M.'s temporary commitment continued, with parents allowed generous supervised visitation. On October 13, 2011, the court adjudicated H.B.M. dependent and continued her placement, where she received physical therapy and on-going medical care.

In the ensuing four and one-half years, H.B.M. remained in residential care where she received medical treatment and physical therapy. Mother and Father attended family service plan ("FSP") meetings and were provided with various objectives designed to facilitate reunification. Their compliance with the FSP objectives varied. Occasionally, parents complied with their objectives and completed services, but they struggled to satisfy other requirements, such as maintaining stable housing and employment.

During March 2015, William Russell, Ph.D. performed parenting capacity evaluations of both parents. As it relates to Father, Dr. Russell opined that Father would need significant support in order to successfully coordinate the services and educational supports that H.B.M. required. The evaluation report noted, particularly, that H.B.M. had been removed from Father's care for five years, and in that time Father was not able to obtain employment, stable housing, or demonstrate an understanding of H.B.M.'s medical needs. Indeed, Father was unable to identify the specific services in place for his daughter.

In sum, Dr. Russell concluded that Father lacked the capacity to provide safety and permanency, and that a long-term medical placement would best suit her needs. Nevertheless, he opined that, since H.B.M. was reportedly bonded to Mother and Father, supervised visitations should continue.

In August 2016, DHS filed a petition seeking to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). During the ensuing hearing on the termination petition, H.B.M. was represented by a guardian *ad litem* and by legal counsel. Father, represented by counsel, was present at the hearing but did not testify on his own behalf.

Dr. Russell testified that Father did not have the capacity to care for H.B.M., and introduced a video of H.B.M. going about her daily routine to illustrate the significant level of care that she requires. N.T., 4/17/18, at 25. Yolanda Bronson-Williford, DHS social worker, testified that it was in H.B.M.'s best interests to terminate Father's rights, and that H.B.M. would not be harmed by termination. *Id*. at 48. She explained that, at the time of the hearing, H.B.M. was not in a pre-adoptive home, but would be referred to the DHS Adoption Unit. *Id*. at 64-65.

During the hearing, Father admitted that DHS had proven by clear and convincing evidence the statutory grounds for termination under § 2511(a). Likewise, he conceded that he was unlikely to demonstrate any parental capacity going forward. Nevertheless, he contested that it was in H.B.M.'s best interests for his rights to be terminated under § 2511(b). *Id*. at 19, 46-47.

As it relates to one of Father's complaints on appeal regarding court interference, DHS presented the testimony of Octavia McLean, H.B.M.'s program specialist at Woods Services, who stated that Father initially spent the majority of every day with his daughter at the facility. However, his prolonged presence interrupted H.B.M.'s daily routine and had a negative impact on her ability to adapt to her new residential environment. *Id*. at 79-80. Thereafter, the trial court reduced the visitations to a total of twelve hours per week, *i.e.*, three four-hour supervised visitations. Following that decision, Father's compliance waned. He missed several visitations, neglected to notify Woods Services in advance of his scheduled visits, would not leave the visitations at the designated time, and continued to disrupt H.B.M.'s daily routine. *Id*. at 83-87. Moreover, Father was rude to the staff at the residential facility, and he withheld consent to medication. Father's outbursts during the visitations increased the frequency of H.B.M.'s maladaptive behaviors, as evidenced by her incidents of self-harm following the visits. *Id*. at 101.

At the conclusion of the hearing, the court terminated Father's parental rights. He timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and Pa.R.A.P. 1925(b).

On appeal, Father raises the following questions for our review:

1[.] Was there sufficient evidence presented to establish under 23 [Pa.C.S. §] 2511(b) that it was in the best interest of the child, H.B.M., to terminate Father's parental rights?

2. Was there sufficient evidence presented to establish under [23 Pa.C.S. §] 2511(b) that Father demonstrated a sincere and genuine desire to maintain a parent-child bond with H.B.M. when it was the court's order that curtailed Father's visits with his child thereby limiting his opportunities to perform the required duties of a parent?

3. Did the [c]ourt commit reversible error when it terminated Father's parental rights when the City's own expert, Dr. William Russell, and the program coordinator from The Woods, Octavia McLean, stated that continued contact with [H.B.M.] was not harming [H.B.M.]'s development or interfering with her ongoing routine and programs at [T]he Woods?

4. Did the trial court commit reversible error and abuse its discretion changing [H.B.M.]'s goal to adoption which is not in the best interest of the child. (Perhaps APPLA [Another Planned Permanent Living Arrangement] would have been more appropriate[?])

Father's brief at 3.[3]

We review cases involving the termination of parental rights according to the following standards.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

_____

[3] As Father failed to present any argument or citation to relevant legal authority specific to his contention that the juvenile court erred in changing H.B.M.'s goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351, that claim is abandoned. *See*, *e.g.*, *Thomas v. Thomas*, __ A.3d __, 2018 PA Super 224, *6 (appellant must support each issue raised by discussion and analysis of pertinent authority; failure to do so hampers this Court's review and risks waiver). Accordingly, we do not address the merits of the juvenile court's goal change order.

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

To affirm the trial court, we need only agree with any one of the subsections of 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we will focus our analysis on § 2511(b), as Father stipulated that DHS had proven grounds for termination under § 2511(a)(1), (2), (5), and (8). Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

The relevant section of 23 Pa.C.S. § 2511 provides that:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

- 7 -

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

As Father conceded to the grounds for termination under § 2511(a), we must consider whether H.B.M.'s developmental, physical, and emotional needs and welfare will be met by termination pursuant to § 2511(b). **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." **Id**. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. **Id**. Ultimately, the concern is the needs and welfare of the child. **Id**. Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. **In re: K.Z.S.**, 946 A.2d 753, 763 (Pa.Super. 2008).

We have noted that

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

- 8 -

***Z.P.***, ***supra*** at 1121 (quoting ***In re C.S.***, 761 A.2d 1197, 1202 (Pa.Super. 2000)). However, love between a parent and child is not the sole determining factor, and love alone is not enough. ***In re J.L.C.***, 837 A.2d 1247, 1249 (Pa.Super. 2003).

Although raised as three separate issues in his statement of questions presented, Father combined all of his arguments regarding § 2511(b) into a single section in his brief. Accordingly, we will address the three claims collectively. Father first argues that the evidence was insufficient to establish that it was in H.B.M.'s best interests for his parental rights to be terminated. Specifically, he contends that DHS failed to establish either an absence of a parental bond, or that the extant bond was harmful to H.B.M. Father continues that he demonstrated a sincere and genuine desire to maintain a parent-child bond with H.B.M., but that the juvenile court curtailed the extent of his visitation and restricted his opportunities to perform parental duties. Finally, Father argues that the evidence does not sustain the conclusion that his continued contact with H.B.M. harmed her development, or interfered with her ongoing routine and programs. In this vein, Father argues that the trial court overlooked what he characterizes as his daughter's diminished "adoptability" in considering whether to terminate his parental rights. Father's brief at 9-10. None of these arguments is availing.

In explaining its needs and welfare analysis pursuant to § 2511(b), the trial court observed:

Now, all the evidence I've heard say that these two parents do not have the capacity to have a parental relationship; both cognitively and emotionally, they're not capable of forming a parental bond because of their limitations. And more importantly, [H.B.M.] is not capable of appreciating what's known as a parental bond.

There are suggestions that [H.B.M.] recognizes these two people as her parents [but] the clear and convincing evidence says otherwise. [H.B.M.] does not recognize them as parental authority—parental figures.

[H.B.M.] has severe limitations, as we've seen through the video and through the testimony—that [she] never recognized, nor does [she] recognize [Mother and Father] as [her] parents, and that's because of the cognitive limitations of [H.B.M.].

Trial Court Opinion, 8/13/18, at 31-32. Thereafter, the trial court concluded that the certified record did not support Father's suggestion that a parental relationship existed between him and H.B.M. simply because she recognizes his presence during visitations, and it reasoned that terminating parental rights would not harm H.B.M. in the absence of a parent-child bond. *Id*. at 32. As explained, *infra*, we do not discern an abuse of discretion in the trial court's statement of rationale.

As previously noted, our case law permits social workers to testify about their observations of the parent-child bond, and it recognizes that, where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *See Z.P.*, *supra* at 1121; *K.Z.S.*, *supra* at 763. Instantly, two caseworkers stated that they did not observe a meaningful parent-child bond, and the certified record does not otherwise sustain a finding that a meaningful bond existed between H.B.M. and Father. One DHS social

worker, Ms. Bronson-Williford, testified that, while H.B.M. recognizes Father's presence, it is not clear whether she knows that he is her **parent**. Similarly, Ms. McLean, H.B.M.'s program specialist, testified that Father's interactions with the child were not always beneficial. She specifically recounted how Father repeatedly interfered with H.B.M.'s daily routines in the residential facility, including impeding H.B.M.'s nighttime routine by refusing to leave at the end of the allotted time. This component of the relationship caused the child distress. For example, following her visitations with Father, H.B.M. engaged in maladaptive behavior, including self-harm. As the trial court found the foregoing testimony credible and persuasive, it was reasonable for it to conclude that no beneficial bond existed between H.B.M. and Father that would be harmful to sever.

Additionally, as it relates to Father's assertion that the trial court interfered with the parent-child relationship by reducing the total duration of the visitations to twelve hours per week, the certified record confirms that the reduction was necessary to address the effect of Father's behavior upon his daughter's wellbeing. If not for Father's persistent interference with service providers and his thinly-veiled attempt to parlay his daughter's residential care into a form of supplemental housing for himself, the trial court would not have been compelled to reduce his visitations. Hence, we reject Father's insinuation that, but for the revised visitation schedule, he would have formed a healthy bond with his daughter.

Similarly, we are not persuaded by Father's argument that the trial court abused its discretion in failing to attribute greater weight to what Father characterized as H.B.M.'s small probability of adoption. In support of this contention, Father highlights that DHS sought to terminate parental rights even though it did not anticipate placing the child for adoption in the immediate future. Based upon testimony that DHS had not referred H.B.M.'s case to its adoption unit, he opines that it is unlikely that the fifteen-year-old will ever be adopted due to her age and medical needs. However, notwithstanding Father's pessimistic speculation, whether or not H.B.M. is likely to be adopted is not the determinative factor in deciding whether the termination of parental rights would best serve her developmental, physical, and emotional needs and welfare.

To be clear, the case law that Father cites in support of his position, *In re Adoption of B.J.R.*, 579 A.2d 906 (Pa.Super. 1990), actually belies his assertion that the fears of diminished "adoptability" take precedence over the statutory grounds for the termination of parental rights. The *B.J.R.* Court stated, "Although the record offers no indication that CYS has found a prospective adoptive family for [the child], this fact does not serve to bar the involuntary termination of parental rights where such termination is otherwise warranted[.]" *Id*. at 915. Hence, notwithstanding Father's protestations to the contrary, the Adoption Act simply did not require DHS to anticipate an immediate adoption in order to pursue the termination of parental rights. In

fact, the law specifically exempts agencies from that requirement. Subsection 2512(b) states, "an agency . . . shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). Accordingly, Father's assertion fails.

For all of the foregoing reasons, we do not disturb the court's finding that clear and convincing evidence supported terminating Father's parental rights to H.M.B. with pursuant to § 2511(a) and (b).

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/18