J-A02036-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: S.A.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: A.M.K. | No. 979 MDA 2015 |

Appeal from the Decree May 8, 2015
in the Court of Common Pleas of York County Juvenile Division
at No(s): CP-67-DP-0000170-2013

| IN RE: ADOPTION OF: S.A.K. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: A.M.K. | No. 999 MDA 2015 |

Appeal from the Order Entered May 8, 2015
in the Court of Common Pleas of York County Orphans' Court
at No(s): 2014-0180

BEFORE:  PANELLA, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MAY 17, 2016**

A.M.K. ("Mother") appeals from the decree and order, dated and entered May 8, 2015, that granted the petition filed by the York County Office of Children, Youth and Families Service ("CYF") seeking to terminate her parental rights to her male child, S.A.K. ("Child"), born in November of 2011, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  We vacate and remand.

---

[*] Former Justice specially assigned to the Superior Court.

[1] In the same decree entered on May 8, 2015, the trial court also terminated the parental rights of Child's father, D.G. ("Father").  Father has not filed an appeal and is not a party in the present appeal.

We adopt the trial court's factual background and procedural history. *See* Trial Ct. Op., 5/8/15, at 1-15. Importantly, on December 16, 2014, CYF filed petitions for the involuntary termination of the parental rights of Mother and Father, and for a change of permanency goal to adoption under Section 6351 of the Juvenile Act. In an order dated January 9, 2015, and entered on January 12, 2015, the trial court scheduled a hearing on the petitions to occur on February 20, 2015. On January 14, 2015, CYF filed the affidavit of attempted service of the Act 101 Notice on Mother via United States Postal Service, which was returned as undeliverable. On February 18, 2015, CYF filed the proof of notice required by the Act 101 Notice on Mother, indicating that she refused to sign for receipt of the notice.

On February 20, 2015, the trial court held an evidentiary hearing on the petitions with regard to Father, as Mother had not received the ten days' notice. N.T., 2/20/15, at 10, 15. Mother had only received notice of the petition and hearing on February 18, 2015. *Id.* at 15. Mother appeared at the February 20th hearing without any counsel to represent her, and she did not waive any defect regarding CYF's service. *Id.* The trial court scheduled the evidentiary hearing to continue on March 12, 2015, with regard to Mother, but proceeded with the hearing as to Father. *Id.*

On March 12, 2015, and March 20, 2015, the trial court held the evidentiary hearings on the petitions with regard to Mother. Mother did not have counsel to represent her, and proceeded *pro se*. Mother arrived late at

the March 12th hearing, which had commenced in her absence. When she arrived, the following exchange took place between Mother and the trial court.

> THE COURT: [Mother]?
>
> [MOTHER]: Yep, I apologize. Your Honor, I would just ask that you show a little bit of leniency. I am learning the process, and I do appreciate that very much.
>
> THE COURT: [Mother], I will provide you with some accommodation given your [sic] self-represented counsel. However, you will be held to the same standards as counsel, as you have chosen to represent yourself in this matter. I may intervene, but I cannot help you present your case. I am not here to represent you, but I do have an obligation to make sure that this matter proceeds in an appropriate manner as are [sic] required by the Rules of Evidence. I need you to compose yourself so you can ask your questions.
>
> [MOTHER]: I'm ready now.
>
> [THE COURT]: Are you ready?
>
> [MOTHER]: Yes.

N.T., 3/12/15, at 12-13.

On May 8, 2015, the trial court entered its final decree and adjudication, involuntarily terminating the parental rights of Mother and Father. On June 8, 2015, Mother, acting *pro se*, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On September 15, 2015, this Court *sua sponte* consolidated the appeals. Moreover, on September 15, 2015, this Court remanded the matter to the trial court to appoint counsel to represent

- 3 -

Mother on appeal, citing 23 Pa.C.S. § 2313(a.1) and 42 Pa.C.S. § 6337, retained jurisdiction, and extended Mother's time for filing her brief. Mother's appointed counsel then filed a brief on her behalf on November 2, 2015.

In her brief, Mother raises three issues on appeal:

> 1. Whether the lower court abused its discretion in keeping the goal in the juvenile dependency action as reunification with a parent[?]
>
> 2. Whether the lower court abused its discretion in the adoption action in involuntarily terminating the parental rights of the mother[?]
>
> 3. Whether the lower court abused its discretion in allowing the mother to represent herself in light of her mental health issues affecting her ability to competently represent herself[?]

Mother's Brief at 6.

We first address Mother's third issue, in which Mother argues that it was contradictory for the trial court to allow her to represent herself when one of her goals was to address her mental health issues. *Id.* at 31. Mother filed her Rule 1925(b) concise statement acting *pro se*, and did not raise the issue of the trial court's failure to appoint counsel to represent her. If the trial court erred by (1) allowing Mother to proceed *pro se*, and (2) failing to appoint counsel to represent Mother in the termination hearings as well as to file her notice of appeal and concise statement, she should not be penalized with waiver. *Cf. In re X.J.*, 105 A.3d 1, 4 (Pa. Super. 2014) (stating that "when a party 'was denied [her] right to counsel—or failed to properly waive

- 4 -

that right—'" in a termination of parental rights case, "this Court is required to raise this error *sua sponte* and remand for the" trial court to correct that mistake); *see generally Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the Statement of Questions Involved in his or her brief on appeal). We thus decline to find waiver.

Appellees CYF and the guardian *ad litem* assert that the trial court appointed counsel to represent Mother in the dependency proceedings on August 19, 2013, and that the trial court discharged her appointed counsel on June 23, 2014, at Mother's request. Appellees' Brief at 22. They argue as follows:

> In spite of the fact that Mother had knowledge of the procedure and process in order to obtain court appointed counsel, she failed to avail herself of this additional request after the discharge of her court appointed counsel. To allege that it was an error of the [c]ourt to not reappoint an attorney to represent Mother is misplaced and not supported in law. A parent has the opportunity to retain an attorney to represent them in the dependency, as well as termination of parental rights proceedings; however, if a parent does not have the financial resources to retain an attorney privately, a procedure and mechanism exists to make application for a court appointed counsel. The record is silent as to any action taken by the [m]other in this regard after the discharge of her attorney in June 2014.

*Id.* at 22-23.

We respectfully disagree with Appellees.  In ***In re X.J.***, a panel of this Court addressed a procedural posture that was very similar to the instant appeal.  In ***In re X.J.***, the juvenile court appointed counsel to represent the mother in dependency proceedings.  ***In re X.J.***, 105 A.3d at 5.  The court then permitted the mother's dependency-proceeding counsel to withdraw; meanwhile, the Lancaster County Children and Youth Social Service Agency's filed a termination-of-parental-rights petition in the orphans' court.  ***Id.*** at 4-5.  The record revealed that the court never appointed counsel to represent the mother in the termination proceedings.  ***Id.*** at 5-6.  The ***In re X.J.*** Court explained the issue posed by the absence of appointed counsel for a termination proceedings:

> Our review of the record reveals an issue pertaining to [the mother's] lack of representation during the termination proceedings below.  The Adoption Act controls termination of parental rights proceedings.  ***See generally*** 23 Pa.C.S.A. §§ 2511–2513.  It provides that a court "shall appoint counsel for a parent whose rights are subject to termination in an involuntary termination proceeding if, upon petition of the parent, the court determines that the parent is unable to pay for counsel or if payment would result in substantial financial hardship."  ***Id.*** § 2313(a.1); ***see also In re J.T.***, 983 A.2d 771, 774 (Pa. Super. 2009) (stating, "an indigent parent in a termination of parental rights case has a constitutional right to counsel . . . [and t]he right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature[ ]") (citations omitted).  An indigent parent in termination proceedings is likewise entitled to be advised of that right.  ***In re Adoption of R.I.***, 455 Pa. 29, 312 A.2d 601, 603 (1973).  This Court has held that when a party "was denied [her] right to counsel—or failed to properly waive that right—this Court is required to raise this error *sua sponte* and remand for the PCRA court to

- 6 -

correct that mistake." ***Commonwealth v. Stossel***, 17 A.3d 1286, 1290 (Pa. Super. 2011). In light of the statutory and constitutional right at stake, we conclude the principle enunciated in ***Stossel*** is appropriate in termination of parental rights cases.

In ***In re J.N.F.***, 887 A.2d 775 (Pa. Super. 2005), this Court held, consistent with the text of Section 2313(a.1), that the parent must request a court-appointed attorney once notified of the requirement to do so. ***Id.*** at 780. In that case, this Court concluded that the father, who was incarcerated, was provided with adequate notice that he was required to affirmatively request an attorney.

> The appointment of counsel for indigent parents in termination proceedings is controlled by 23 Pa.C.S.A. § 2313(a.1), which states, in pertinent part, the following:
>
>> (a.1) PARENT.—The court shall appoint counsel for a parent whose rights are subject to termination in an involuntary termination proceeding if, ***upon petition of the parent***, the court determines that the parent is unable to pay for counsel or if payment would result in substantial financial hardship.
>
> (emphasis added).
>
> In [that] case, the original termination petition contained a notice that stated the following:
>
>> You have a right to be represented at the hearing by a lawyer; however, it is not necessary to have a lawyer at this hearing. A court-appointed attorney will be assigned to represent you if you cannot afford legal help. The Family/Orphans' Court Administrator will be present at this hearing. She will give you an application for request of a court-appointed attorney. This attorney will represent you at your [termination hearing]. If you have any questions, contact [the Family/Orphans' Court Administrator].

*See* Notice, 9/4/2004.

*Id.* This Court concluded that the orphans' court was not required to appoint counsel because the father did not request court-appointed counsel after he received notice of his right to do so. *Id.*

However, in this case, [the mother] was not advised of her right to counsel in the termination proceeding. Neither the termination petition, nor the orphans' court's preliminary decree contained any type of notice provision described in *In re J.N.F.* Furthermore, the certified record does not contain any indication that [the mother] was served with **any** of the filings in the termination proceedings below, except for the final termination decree that is the subject of this appeal. Since [the mother] was never notified of the proceedings against her, her right to counsel, or of her obligation to request the same, we deem the certified record's silence on [the mother's] application for counsel immaterial for the purposes of this appeal. Based on these considerations, we conclude that *In re J.N.F.* does not present an impediment to our decision in this case.

\* \* \*

Furthermore, our review of the record reveals there were no orders appointing counsel for [the mother] for the purposes of the termination proceedings, nor evidence of any notice to [the mother] of her right to counsel.

Thus, the certified record reveals that [the mother] did not receive counsel for the purposes of termination proceedings, even though she was entitled to representation. *See, e.g., Stossel*, *supra*; *In re J.T.*, *supra*. Nor does the record indicate that [the mother] was ever advised of her right to counsel for termination proceedings. *See In re Adoption of R.I.*, *supra*. Therefore, we believe the best course of action is to remand this case for a new termination hearing, before which the orphans' court shall advise [the mother] of her counsel rights, appoint counsel for [the mother], or

affirmatively determine that [the mother] does not qualify for counsel.

Based on the foregoing, we conclude that [the mother's] right to counsel was violated in the termination proceedings below. Accordingly, counsel's petition to withdraw is denied, the orphans' court's April 21, 2014 decree is vacated, and the case is remanded for further proceedings, consistent with this opinion.

*In re X.J.*, 105 A.3d at 4-7.

In the instant appeal, identical to *In re X.J.*, our review of the record reveals there were no orders appointing counsel for Mother for the purposes of the termination proceedings, and there is no any evidence of any notice to Mother of her right to counsel. *See id.* Neither the termination petition, nor the notice of hearing, nor any other record document set forth the provision regarding Mother's right to counsel as provided in Section 2313(a.1) of the Adoption Act. *See id.* Thus, the certified record reveals that Mother did not have appointed counsel for the purposes of termination proceedings, even though she was entitled to representation. *See id.* (citing *Stossel*, 17 A.3d at 1290; *In re J.N.F.*, 887 A.2d at 780). The record also does not indicate that Mother was ever advised of her right to counsel for termination proceedings. *See id.* (citing, *In re Adoption of R.I.*, 312 A.2d at 603). Accordingly, we conclude that Mother was deprived of her right to counsel in the termination proceedings. *See id.* at 7. Thus, we remand this case for a new termination hearing, before which the orphans' court shall advise

Mother of her counsel rights, appoint counsel for Mother, or affirmatively determine that Mother does not qualify for counsel.[2] *See id.*

Decree vacated. Case remanded with instructions as set forth above. Jurisdiction relinquished.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/2016

---

[2] In light of our resolution of this matter, we do not address Mother's remaining issues.

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

In Re: Adoption of               :

     S███A███ K███████,   :    No. 2014-0180

            A Minor      :    Termination of Parental Rights

APPEARANCES:

Martin Miller, Esquire                     David Worley, Esquire

Office of Children, Youth & Families       *Guardian Ad Litem*

A█████ K████████

Self-Represented

## ADJUDICATION

Presently before the Court is the Petition for Involuntary Termination of Parental

Rights of A█████ K████████ (hereinafter "Mother") to the above-captioned minor child

filed on December 16, 2015. An evidentiary hearing was originally scheduled to occur

regarding the petition on February 20, 2015. Mother was provided with insufficient notice of

the hearing, having only been served with the scheduling Order on February 18, 2015. Mother

did appear at the February 18, 2015 hearing and requested a continuance. The Court at that

time provided her with personal notice of the continued hearing date of March 12, 2015. After

the hearing on March 12, 2015 adjourned, Mother represented that she was denied the

opportunity to present additional exhibits for entry into the record. The Court therefore

scheduled an additional continued hearing to permit Mother to exchange exhibits for

admission into the record and to provide the parties with an opportunity to present summation

on March 20, 2015. Mother was not prepared to offer any credible evidence, and failed to

I

comply with the specific timeline set forth. Therefore, she was deemed to have waived the presentation of additional evidence.

Based upon the evidence presented at the hearings, and upon consideration of the record, the Petition for Involuntary Termination of Parental Rights of Mother to S██ A██ K███████ is GRANTED for the reasons outlined herein.

## FINDINGS OF FACT

1. The record docketed at CP-67-DP-170-2013 with the Clerk of Courts in the Court of Common Pleas in York County was incorporated into the Orphans' Court record docketed as above with no objection.

2. S██ A██ K███████ (hereinafter "S.K.") was born November 27, 2011.

3. A█████ K███████(hereinafter "Mother") is the natural mother of S.K.

4. D███ G█████ (hereinafter "Father") is the biological father of S.K. Father's parental rights have also been terminated; the reasons for that termination are set forth in a separate Adjudication.

5. An Application for Emergency Custody in the related Dependency action was filed by the Agency on August 5, 2013. The allegations included:

    a. On or about August 3, 2013, [the Agency] received a referral regarding the minor child, [S.K.], due to allegations of homelessness and lack of supervision.

    b. Allegations received were that the mother and the minor child were "living out of" a car; there were also two small dogs inside the vehicle.

    c. The car was parked on the street by Albemarle Park.

2

d. The mother requested a woman to assist her in "jump starting" the vehicle.

e. The woman requested that her son assist and he drove over to the mother's vehicle.

f. The man's dog jumped out of his car and was hit by another vehicle.

g. The man and the mother got into his car and drove the man's dog to a veterinarian; the mother left her son and the two small dogs in the car.

h. The woman stood by the car and watched the minor child.

i. Upon the mother's return to her vehicle, she was allegedly acting and speaking eratically [sic].

j. The York City Police were contacted and responded to the scene.

k. The mother stated that the father was a D██ G████, however, was unable to provide his address or telephone number.

l. The mother further stated that her mother and her sister were alcoholics and would not provide any information.

m. The mother was transported to the York Hospital Psychiatric Unit where she was admitted on a 302 commitment.

n. The York City Police Department took twenty-four hour protective custody of the minor child on August 3, 2013.

o. On August 4, 2013, [the Court] was contacted and verbally awarded temporary legal and physical custody of the minor child, [S.K], to [the Agency] for continued foster-care placement.

3

6. An Order to Reaffirm the Verbal Order..., Schedule Protective Custody Hearing, and Summons was entered on August 5, 2013.

7. A Shelter Care Order was filed on August 13, 2013. Legal and physical custody of S.K. were awarded to the Agency. S.K.'s placement in foster care continued. Mother was afforded supervised visitation with Mother twice per week.

8. A Dependency Petition was filed regarding S.K. on August 14, 2015. The allegations set forth in the Dependency Petition were consistent with the allegations in the Application for Emergency Custody, but included several additional averments, including:

    a. The mother was discharged from York Hospital on August 7, 2013 and has been living with a friend in York, Pennsylvania but cannot continue there because of her dogs.

    b. The mother indicated she is in the process of securing an apartment from a friend; she will be staying with her dogs in a hotel until she secures that apartment.

    c. The mother allegedly has mental health issues and is prescribed Carbamazephine and Fluphenazine.

9. Mother requested county-paid court-appointed counsel on August 19, 2013. In an Order filed on August 20, 2013, the Court appointed Attorney Gillian Woodward to represent Mother. At the time of the October 7, 2013 expedited review, Mother indicated a desire to secure alternate counsel. Attorney Woodward agreed to remain Mother's counsel until new counsel entered an appearance or Mother executed an entry of appearance form.

4

10. An Order of Adjudication and Disposition was entered on August 20, 2013 after consideration of the petition and by the agreement of all parties. The contents of that Order are hereby incorporated as if set forth more fully herein. The findings of the Court in that Order include, but are not limited to:

   a. Mother is returning to the home of her husband, but does not have stable housing at this point. She has recently been released from [York] Hospital after a 302 admission. Father acknowledges that he is not a resource for the child at this time. He does admit to paternity.

   b. [S.K.] is to be placed, by the agency, in foster-care placement. [S.K.]'s placement is the least restrictive alternative that meets the needs of the child and there is no less restrictive alternative available, in that: neither parent is a resource for the minor child at this time and no relative has yet been approved, whereby foster-care placement is the least restrictive alternative available.

   c. Maternal grandmother [B███ W████] may also have supervised visits with the view toward possible placement of the child with the maternal grandmother.

   d. The child is safe in the current placement setting.

   e. The current placement goal for the Child is adoption.

   f. [The Court specified the following tests to occur]: random drug and alcohol screens of parents and maternal grandparents [B██ W███ and G███ W███].

5

g.  Legal and physical custody of the minor child, [S.K.], shall continue in [the Agency] for continued foster-care placement until further review for family placement.

11. As part of the Court-Ordered Services/Conditions appendixed to the August 20, 2013 Order, the Court ordered certain directives, which included but were not limited to the following:

a.  Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

b.  Mother shall cooperate in obtaining a psychological evaluation which shall be performed by agreed upon evaluator or another appropriate organization or evaluator. The named person(s) shall contact the designated evaluator, or an appropriate organization or evaluator approved by the Agency to do the evaluation, within 10 days of this date, and the evaluation shall be completed, and the results made known to the Agency within 60 days of today's date. The named person(s) shall follow through with any recommendations made as a result of any evaluation conducted in this matter.

c.  Mother shall attend counseling sessions with Wellspan Behavioral health at Edgar Square or another qualified counselor.

d.  Mother shall cooperate with the following services...in-home team[,] Justice Works.

6

e.  Supervised visitation at [the Agency] between [S.K.] and [Mother] from 9:00 a.m. to 11:00 a.m. on Tuesday and Thursday. Father shall contact Agency to schedule his visit.

f.  [Mother] will cooperate and comply with the recommendations made upon discharge from Wellspan Crisis.

g.  Parents shall execute an acknowledgement of paternity.

12. A 45-Day Expedited Review occurred on October 7, 2013. The findings made by the Court have been incorporated as if set forth more fully herein.

13. By November 13, 2013, Mother was exercising three visits per week. At that time, the Court approved partially unsupervised contact.

14. Mother requested assistance from CPC.[1] She was denied assistance.

15. Mother, through Attorney Woodward, filed a Request for Release of Transcripts on January 10, 2014. The Court granted the request, provided Mother paid for each transcript she has received.

16. A Permanency Review hearing originally scheduled for January 21, 2014 was continued until January 29, 2014 at Mother's request. She requested the continuance because she wished to obtain alternative counsel and give the new counsel the opportunity to review the case.

---

[1] CPC is the Community Progress Council. The Court is familiar with this community program that promotes self-sufficiency for low- to moderate-income residents of York County. CPC provides emergency assistance with food, heat, and other basic needs, as well as assistance with housing.

17. A Permanency Review Order was entered on January 29, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

   a. The placement of the child continues to be necessary and appropriate.

   b. There has been minimal compliance with the permanency plan as to the mother...

   c. [Mother has made] minimal progress toward alleviating the circumstances which necessitated placement...

   d. The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is undetermined due to lack of progress by his parents. It is hopeful that he can be returned within three to six months, but unlikely in that time. The concurrent placement plan for the child is placement with a fit and willing relative.

   e. Legal and physical custody shall remain with [the Agency].

   f. Placement of the Child remains in foster-care placement with R████ and C████ B████

18. As part of the Court-Ordered Services/Conditions appendixed to the January 29, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

   a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

8

23. A Permanency Review Order was entered on June 23, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

    a.   The placement of the child continues to be necessary and appropriate.

    b.   There has been minimal compliance with the permanency plan as to the mother…

    c.   [Mother has made] no progress toward alleviating the circumstances which necessitated placement…

    d.   The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is undetermined due to lack of progress by his parents. The concurrent placement plan for the child is placement with a fit and willing relative. The permanency plan developed for this child, dated January 29, 2014…is appropriate and feasible except that it shall be modified or supplemented as follows: …Agency to explore permanency options for the child, including change of the concurrent goal to adoption given the lack of progress by the parents and failure of any viable family to come forward to be a resource for the child. Although the maternal grandmother has contact, she has indicated that she is not a resource for Child. Father has not had any contact and has not shown any interest in his son.

    e.   Legal and physical custody shall remain with [the Agency].

    f.   Placement of the Child remains in foster-care placement with R█████ and C█████ B█████

10

24. As part of the Court-Ordered Services/Conditions appendixed to the June 23, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

    a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

    b. Mother shall attend counseling sessions...The counseling shall be Individual Counseling.

    c. Mother shall cooperate with...Justice Works.

25. From January until April 2014, Ms. Hill was meeting with Mother twice per week. The sessions decreased eventually to bi-weekly.

26. On June 23, 2014, the appointment of Attorney Woodward was vacated due to Mother's repeated expressed desire to represent herself.

27. A Status Hearing Order was entered on September 22, 2014. Its contents are incorporated as if set forth more fully herein.

28. A Blended Perspective Meeting was held November 4, 2014.

29. During one of S.K.'s medical appointments, Mother left twice to check on her dogs.

30. A Permanency Review Order was entered on December 3, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

    a. The placement of the child continues to be necessary and appropriate.

    b. There has been minimal compliance with the permanency plan as to the mother...

11

c.  [Mother has made] minimal progress toward alleviating the circumstances which necessitated placement…

d.  The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is unlikely given [Mother's] lack of progress. The concurrent placement plan for the child is adoption. …the concurrent goal shall be pursued by the Agency as the primary goal given the lack of progress by [S.K.]'s parents.

e.  Legal and physical custody shall remain with [the Agency].

f.  Placement of the Child remains in foster-care placement with R█████ and C█████ B████.

31. As part of the Court-Ordered Services/Conditions appendixed to the December 3, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

a.  Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

b.  Mother shall attend counseling sessions…The counseling shall be Individual Counseling.

c.  Mother will provide the Agency with pay stubs, paid rent receipts or escrow account and paid utility receipts.

12

32. On November 6, 2014, Mother provided a written explanation as to why she was declining testing. Mother stated "[i]f [the prescription] was such an issue [at] any point in time during this month process, I would have provided a prescription bottle or script at any point in time." She has not provided this documentation to the Agency at any time.

33. On December 12, 2014, Mother filed a copy of a Mental Health Update Report dated September 19, 2014 labeled, "Exhibit B FOR STATUS HEARING 9/22/14 & FOR DEPENDENCY HEARING 12/03/14." Although a copy of the same report was later admitted to the record, the document labeled by Mother was not entered as an exhibit at either hearing for the Court's consideration.

34. On December 16, 2014, the Petition for Hearing to Change Court-Ordered Goal was filed by the Agency.

35. The Petition for Involuntary Termination of Parental Rights related to both Mother and Father was filed on December 16, 2014.

36. Mother filed a Petition for Leave to Proceed In Forma Pauperis on January 2, 2015. She also filed a document she titled a "Petition/Motion for Appeal of Child Dependency Hearing Held December 3, 2014" on January 2, 2015. A number of documents, some handwritten and others modified by Mother, were attached to the petition. She also filed a "Petition/Motion for the Request of Following Transcripts Listed Below" on January 2, 2015. No Certificates of Service were filed regarding these petitions. The Court later became independently aware of the existence of the documents. Without notice of the documents, the Court was unable to timely rule upon them.

13

37. A Permanency Meeting was held on January 5, 2015.

38. On January 7, 2015, Mother filed a document she titled a "Petition/Motion for an Appeal of Child Dependency Hearing Held on 12-3-2014." The petition does not appear to have been recognized as a Notice of Appeal and was not forwarded to the Superior Court for consideration. In any event, it was not timely filed. Mother filed a Concise Statement of Matters Filed on the Appeal on January 30, 2015.

39. The request for transcripts Mother made on January 2, 2015 was forwarded to the Court Reporters by the Clerk of Courts and transcripts were produced. The transcripts were forwarded to counsel and Mother. No Order was entered directing release of the transcripts.

40. On January 29, 2015, Father was personally and timely served notice of the February 20, 2015 hearing related to the Petitions for Involuntary Termination of Parental Rights and Change of Goal. Mother was not timely served notice of the hearing. She did appear at the February 20, 2015 hearing, but did not waive any defect in service. On February 20, 2015, the Court did hear evidence on the termination petition as it related to Father and continued the remainder of the hearing to March 12, 2015 at 9:00 a.m. At that time, the Court would hear evidence on the ninety-day Status Hearing and on the petitions to change the Court-ordered goal and for the involuntary termination petition as it related to Mother. Mother received personal notice on February 20, 2015 of the continued hearing.

41. A Stipulation of Counsel was filed on February 18, 2015. Mother did not agree to the stipulation. The Court did not consider it in rendering its Order in this matter.

14

42. The March 12, 2015 hearing was scheduled to begin at 9:00 a.m. Mother arrived at approximately 9:12 a.m. Later that day, the Court took a recess at 2:26 p.m. and the Court told counsel and Mother it would reconvene at 2:35 p.m. Mother did not appear at 2:35 p.m. After waiting for a few minutes, the Court reconvened at 2:37 p.m. Mother was still not present. Mother did not appear until 2:54 p.m. without explanation.

43. At the close of the hearing on March 12, 2015, Mother indicated that she was being precluded from presenting evidence to support her case. Counsel and Mother were directed to appear at 8:30 a.m. on March 20, 2015 to provide Mother with an additional opportunity to propose exhibits for entry into the record for the Court's consideration. Counsel and Mother were notified that failure to timely appear or to timely exchange exhibits would result in that individual waiving his or her opportunity to present additional evidence. The Court entered an Order on March 13, 2015[2] setting forth a schedule for presentation of that evidence. Mother did not comply with the schedule and therefore was deemed to have waived the right to present the additional evidence. Mother did not appear timely. Mother was directed to provide copies of her proposed exhibits to counsel. She did not.

44. A Status Hearing Order was entered on March 12, 2015. Its contents are incorporated as if set forth more fully herein.

45. The Court denied the Change of Goal petition on March 20, 2015.

---

[2] The Order was entered March 13, 2015 with the Clerk of Courts and March 17, 2015 with the Orphans' Court. Mother received notice of the Order by her own admission as early as March 16, 2015.

15

46. Misty Stevenson was the York County Office of Children, Youth & Families (hereinafter "the Agency") caseworker assigned to the family. She was involved with the family for approximately seventeen months at the time of the termination hearing.

47. Workers from the Family Group Decision Making (hereinafter "FGDM") service met on August 23, 2013, but Mother was either not able to or did not participate. A FGDM was scheduled for September 30, 2013 and was canceled by Mother. A Family Group Decision Making meeting was held in this matter on November 18, 2013. Mother and maternal grandmother, Ms. W████, participated in that meeting. A plan was generated as a result of that meeting and there has been some compliance with that plan by Mother.

48. Four Family Service Plans were created for the family and were dated as follows: August 26, 2013; January 29, 2014; June 23, 2014; and December 3, 2014.

49. Father was unaware of S.K.'s existence until after the Agency became involved.

50. S.K. is thriving in his foster home. He is quick to show emotion to his foster family.

51. A pre-adoptive resource has been identified.

52. A referral was received by FUN on August 20, 2013 to test randomly Mother once a week. Mother was successfully tested thirty-six times and was unavailable ten times. Mother was deemed unavailable once due to the drug monitor's misunderstanding of where the entryway to Mother's residence was located. Mother refused to be tested thirteen times between October 17, 2014 and February 20, 2015; she refused to be tested until she obtained copies of transcripts from the Court proceedings that occurred during the course of S.K.'s adjudication. Mother wrote out reasons for refusing the test each time

16

she refused. She tested positive twenty-seven times. All of those twenty-seven tests were positive for Adderall, a medication Mother claims is prescribed to her. Additionally, four of those tests were positive for marijuana. Mother tested positive for both Adderall and THC on February 27, 2015.

53. Tiffany Nulph was a Justice Works YouthCare (hereinafter "Justice Works") Family Resource Specialist assigned to work with Mother. Justice Works received a referral to begin services on August 13, 2013. Ms. Nulph supervised visits between Mother and S.K. She also helped Mother establish and work toward seven goals: (1) demonstrate basic self-sufficiency; (2) participate in meaningful supervised visits; (3) address mental health needs; (4) seek appropriate means of transportation; (5) demonstrate effective communication skills with the team; (6) demonstrate a basic understanding of household management; and (7) demonstrate basic employability skills. The goals were established as a collective effort. Mother was to meet with Ms. Nulph two to three times per week. Mother sometimes did not show or was tardy to appointments and at other times cancelled appointments last minute. Mother was generally compliant with the service, but did not demonstrate an ability to progress substantially. Services closed out on September 26, 2014. Justice Works labeled the closure as unsuccessful because S.K. had not been returned home.

54. Since the adjudication of S.K., Mother has reportedly obtained various jobs, including at a crab shack and various other restaurants. However, Mother has provided only two legal paystubs to the Agency, both from the crab shack. She at times requested financial

17

assistance from churches. Mother also reports earning money by providing spiritual services and has provided five receipts from those services in January of 2014. She signed an affidavit on December 12, 2014 indicating her intent to file a document to establish self-employment, but has not filed the document.

55. Mother's vehicle is not a reliable means of transportation.

56. Mother was involuntarily hospitalized from August 4, 2013 until August 7, 2013.

57. At the time of the Application for Emergency Custody, the Agency averred Mother was at the York Hospital Psychiatric Unit, but had been residing in her car. At the time the Dependency Petition was filed, Mother was residing at 1630 Randow Road in York. The Agency was aware of the following addresses for Mother since the adjudication of S.K. in August 2013: at an efficiency in the Midway Hotel at 211 North Main Street in York, Pennsylvania from August 20, 2013 until December 12, 2013; with a friend at the Midway Hotel from December 13, 2013 until December 17, 2013; at the Super 8 Motel in York, Pennsylvania from December 18, 2013 until December 22, 2013; with the same friend at the Midway Hotel, Chateau Motel, and the Travelodge at various times between December 23, 2013 until January 2, 2014; with a friend named Benjamin Hoover on Colony Drive in York, Pennsylvania from January 2, 2014 until February 1, 2014; with a friend named Patricia at 1000 Country Club Road in York, Pennsylvania from February 2, 2014 until March 9, 2014; at the Motel 6 in York, Pennsylvania from March 10, 2014 until April 24, 2014; with a friend named Terry on South Street from April 25, 2014 until May 15, 2015; at the Motel 6 in York from May 18, 2014 until June 28, 2014; with a

18

friend on Roosevelt Avenue from June 29, 2014 until July 18, 2014; at 339 West Main Street in Dallastown, Pennsylvania from July 19, 2014 until sometime in February 2015; and thereafter on East King Street. The following locations were visited by the Agency and were deemed suitable residences for reunification: the efficiency at the Midway Hotel and the 339 West Main Street apartment in Dallastown. The following locations were visited by the Agency and were found not to be suitable residences for reunification: Mother's room at the Super 8 Motel. Mother was not always available during attempts by the Agency to visit her residences.

58. Mother is often not forthcoming with information.

59. Mother is often tardy.

60. Mother has varicose veins affecting at least one leg.

61. If Mother has not arrived within twenty minutes of the scheduled visit, the visit is canceled. Although frequently tardy, Mother now typically arrives within that window.

62. S.K. continues to have contact multiple times per month with Ms. W████. His foster mother and Ms. W████ cooperate with one another to schedule these visits.

63. S.K. refers to Mother as "Mommy" or "A████." He refers to his foster mother as "Mommy," "Mommy Two," or "Mommy C████."

64. S.K. has been with his foster family for nineteen-and-a-half months. When he first was placed with the foster family, he was very reserved and would hide if someone knocked on the door. He began opening up after three months. S.K.'s basic needs are met by his

foster family. He sometimes expresses displeasure at attending visits with Mother, but he is okay once Mother arrives.

65. By the time of the evidentiary hearing on March 12, 2015, Mother was permitted three visits with S.K. per week for two hours at a time. During visits, Mother shows S.K. affection and the two play together or watch videos. Her visits are partially supervised. Mother has never progressed to visiting S.K. unsupervised. She is also permitted a five-minute phone call with S.K. on Monday mornings. The phone calls were permitted pursuant to the April 21, 2014 Status Hearing Order.

66. Mother has at times randomly provided S.K. with gifts.

67. Mother has attended S.K.'s medical appointments.

68. Other than Adderall, Mother does not want to take prescription medication.

69. Different diagnoses have been suggested as a result of Mother's mental health being evaluated: In August 2013, during Mother's 302 hospitalization, the tentative diagnosis was recorded as bipolar effective disorder, most recent episode manic; rule out cannabis abuse; upon discharge from the 302 hospitalization, the diagnosis was recorded as mood disorder, not otherwise specified; cannabis abuse; and nicotine dependency. An evaluation at Edgar Square in September 2013 revealed similar concerns with bipolar disorder and cannabis dependence. Recommendations included medication and to participate in therapy. In January 2014, Mother was diagnosed by her current therapist, Deborah Hill, as having adjustment disorder, unspecified, and attention deficit disorder by history.

20

70. Deborah Hill is a licensed clinical social worker with her own practice. Her focus tends to be on trauma and grief. Mother contacted Ms. Hill in December of 2013 to begin counseling. Mother has engaged in twenty-seven sessions with Ms. Hill. Mother's contact with Ms. Hill was initially every week, but then was reduced to every other week. Ms. Hill permits Mother to engage in either office sessions or phone sessions. In-office sessions last approximately sixty to eighty minutes; phone sessions last approximately twenty to thirty minutes. Mother had the following sessions with Ms. Hill from November 2014 until March 2015: Mother did not have any sessions in March prior to the March 12, 2015 hearing; she had two sessions in February, one by phone and one in face-to-face; one face-to-face session in January; one session in December; two face-to-face sessions and one session by phone in November. Ms. Hill believes there is still a need for Mother to continue in counseling.

71. Mother is diagnosed with attention deficit disorder.

72. Warrants have been issued for Mother's arrest during S.K.'s adjudication. The most recent warrant resulted in Mother's incarceration from February 20, 2015 until February 23, 2015.

73. The following exhibits were admitted into evidence: Mother's Exhibit A; Mother's Exhibit J; Children, Youth & Families Exhibit 6; Children, Youth & Families Exhibit 7; Children, Youth & Families Exhibit 8; Children, Youth & Families Exhibit 9; Children, Youth & Families Exhibit 10; and Children, Youth & Families Exhibit 11.

21

74. The following exhibits were not admitted for the Court's consideration: Mother's Exhibit D; Mother's Exhibit I; Mother's Exhibit M; Mother's Exhibit N; Mother's Exhibit K; a document Mother referred to as Exhibit O that is unlabeled; and Children, Youth & Families Exhibit 5.[3]

## DISCUSSION

The Agency petitioned this Court to involuntarily terminate the parental rights of Mother to S.K. on the grounds presented in 23 Pa. C.S. § 2511(a)(1), (a)(2), (a)(5), and (a)(8) of the Adoption Act. The applicable provisions appear as follows:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with the agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or

---

[3] Certain exhibits were not admitted for consideration as those documents relate to the petition against Mother; however, certain of these exhibits were admitted for consideration as those documents relate to the petition against Father.

22

placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8).

The Court notes that, at the termination hearing, Mother voiced a concern that adoption is not even addressed until fifteen months has passed. Confusion may stem from 42 Pa.C.S.A. § 6531(f)(9), which appears on the Permanency Review Orders provided to the parties at hearings and reads:

> If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
>
> (i) The child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
>
> (ii) The county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child, or
>
> (iii) The child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6531(f)(9). However, the aforementioned statute creates an exemption, if applicable, for consideration in the dependency matter. See *In re D.C.D.*, 105 A.3d 662 (Pa.Super. 2014). The statute does not alter or effect the provisions for consideration under Section 2511 of the Adoption Act. The provisions of Section 2511(a) establish six and twelve month timelines. 23 Pa.C.S. § 2511(a)(1), (a)(5), (a)(8). Other provisions do not require that a certain period of time lapse before termination of parental rights can be sought. *Id.* at 23 Pa.C.S. § 2511(a)(2). The process of reunification or adoption should be completed within

23

eighteen months. *R.J.S.*, 901 A.2d at 507 (internal citations omitted).

To terminate pursuant to Section 2511(a)(1), the Agency need not produce evidence of both an intent to relinquish and a failure to perform necessary duties. *In re C.M.S.*, 832 A.2d 457, 461 (Pa.Super. 2003) (citing *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). Also, the six month time period established by Section 2511(a)(1) should not be "applied mechanically." *In Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super. 1997). It is the role of the court to "examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine it the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *Id.*

The Supreme Court of this Commonwealth has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citing *In re Burns*, 379 A.2d 535 (Pa. 1977)). A parent must make a "sincere and genuine effort" to maintain a relationship, use all available resources to preserve the bond, and resist obstacles. *Id.* (citing *In re Shives*, 525 A.2d 801, 803 (Pa.Super. 1987)). A parent who yields to obstacles may forfeit his or her parental rights. *In re Involuntary Termination of Parental*

24

*Rights to E.A.P., a Minor*, 944 A.2d at 83 (citing *In re A.L.D.*, 797 A.2d at 340).

Section 2511(a)(2) focuses on the child's present and future need for proper care. *In re Involuntary Termination of Parental Rights to E.A.P., a Minor*, 944 A.2d 79, 82 (Pa.Super. 2008) (hereinafter "E.A.P.") (citing 23 Pa.C.S.A. § 2511(a)(2); see *In re R.I.*, 361 A.2d 294 (Pa. 1976)). Whether termination is appropriate under Section 2511(a)(2) is not limited to affirmative misconduct. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)(citing *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). Subsection (a)(2) emphasizes the child's "need for essential parental care, control, or subsistence necessary for his physical or mental well-being." *Id.* (citing *E.A.P.*, 944 A.2d at 82). The Superior Court has further explained the way in which this subsection should be interpreted by this Court:

> Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it. [Id.] Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). [internal citations omitted]. "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [internal citations omitted].

*Id.* at 1117-18.

Pursuant to Section 2511(a)(8), "...[w]here a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, a court may find that...section 2511(a)(8) has been satisfied." *In re T.A.C.*, --- A.3d ---, *2 (Pa.Super. 2015) (citing *In re D.A.T.*, 91 A.3d 197 (Pa.Super. 2014)). This Court believes this principle applies also to Section 2511(a)(5).

25

Once the Court has determined that one or more of the statutory requirements under § 2511(a) are satisfied, the Court must also engage in an analysis of "[o]ther considerations," pursuant to 23 Pa.C.S.A. § 2511(b):

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). "A parent's basic constitutional right to the custody and rearing of...her child is converted, upon the parent's failure to fulfill...her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)(internal citations omitted). A child has the right to care in a permanent, healthy, safe environment. See *In re K.M.*, 53 A.2d 781, 792 (Pa.Super. 2012) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)). "...[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.*

When determining whether termination of parental rights is in the best interest of the child, love, comfort, security, stability and other intangibles must be considered during the inquiry. *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The Court must consider that continuity of relationships is important to children and also weigh the safety needs of the

26

child. *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super. 2003)(citing *In the Interest of C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000)); *In re A.D.*, 93 A.3d at 898 (internal citations omitted).

The Court is also required to analyze whether a bond exists between the parent and child. The Court must "examine the status of the bond [between parent and child] to determine whether its termination 'would destroy an existing, necessary, and beneficial relationship." *Id.* When a child has a close relationship with a parent, severance of close parental ties is usually "extremely painful." *In Interest of C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000) (citing *In re William L.*, 383 A.2d 1228, 1241 (Pa. 1992)). The mere existence of an emotional bond does not preclude a determination that a termination is in the best interests of the child. *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). It is but one of the factors the Court must consider. *In re A.D.*, 93 A.3d at 897. As recently indicated by the Superior Court, the Court is not required to ignore safety concerns simply because a bond exists between the child and a parent. See *In re M.M.*, 2014 WL 6756296 (Pa.Super. 2014). The party seeking termination of parental rights must demonstrate the asserted grounds for termination are valid by "clear and convincing evidence." *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005)). Clear and convincing evidence is defined as evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

27

The simple fact that something was stated and was memorialized in the transcript does not mean that the statement itself is considered fact or that the statement is evidence for the Court to consider. The Court is not required to accept all statements as true. The Court "is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the...court is free to believe all, part, or none of the evidence." *In re N.C.*, 909 A.2d 818, 823 (Pa.Super. 2006)(citing *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa.Super. 2006)). This Court, therefore, considers not only to the evidence presented, but takes into consideration the manner in which that evidence is presented.

At the outset, the Court did not find Mother to be a credible witness. Mother is historically not forthcoming with information. The Court believes, that many of the discrepancies in Mother's testimony are not intentional, but rather Mother presents what she believes is the truth, even if she is mistaken. During her testimony on March 12, 2015, she stated, "We didn't want to be there for six or seven hours. I had a place to live. I was living with a family that lived on Argyle Street. 1074 Argyle Street...They are scared of the system, too, and they are people of God, because they were worried about getting involved because one minute I was living with them and the next minute I'm calling them from a psychiatric ward to come pick me up, and they are like, whoa, you know?" This testimony indicates that on August 3, 2013 Mother's address was 1074 Argyle Street. Later in her description of the same day, Mother described her address to the police officer as "███████ ████ Street, York." Mother also testified that S.K. "never" had any accidents with her, "not one time," and

28

then admitted that he "might have had one or two accidents with me." The Court finds that some of her testimony was clearly contradictory, inconsistent, or showed evidence of dishonesty.

The Court also did not find Ms. Stevenson to be a credible witness related to certain components of her testimony. For example, Ms. Stevenson testified that Mother had two restaurant jobs, when a review of the record clearly indicates that Ms. Stevenson herself had communicated with a number of other employers throughout the course of S.K.'s adjudication.

The Court took the lack of credibility of both of these witnesses into consideration in rendering its determination on the termination petition.

### Section 2511(a)(1)

No credible evidence was demonstrated that Mother demonstrated a settled purpose to relinquish her parental rights to S.K. On the contrary, since the adjudication of S.K. in August 2013, Mother has continued to perform some parental duties on behalf of her son. Mother keeps in contact with S.K., visiting with him approximately three days per week and speaking with him once a week by phone. She attends some of S.K.'s medical appointments and provides him with gifts. She has made a sincere effort to remain a part of S.K.'s life. The Court does therefore decline to terminate Mother's rights pursuant to this subsection.

### Section 2511(a)(2)

Mother engaged in sincere efforts to perform some parental duties sufficient for this Court to determine that the Agency did not carry its burden by clear and convincing evidence

29

that termination of her parental rights pursuant to Section 2511(a)(1) was appropriate. However, the Court does find that sufficient credible evidence was presented in order for the Court to make a finding that a termination of parental rights under Section 2511(a)(2) is supported by the record.

Although the competent evidence presented does not suggest there is a question of repeated and continued abuse or neglect of S.K. by Mother or a refusal of Mother to parent S.K. The credible evidence, however, does support a finding that Mother remains incapable of providing S.K. the essential parental, care, control, and subsistence necessary for his mental and physical well-being. The credible evidence presented also indicates that the cause of the incapacity will not be remedied by Mother, at least not within the foreseeable future.

Mother has not demonstrated an ability to operate in a fashion that would provide a safe environment for S.K. Her behavior demonstrates a clear lack of an ability to prioritize the needs of her son and an inability to control her impulses and exercise proper judgment, to wit: In addition to leaving her child with a stranger, which led to the original placement, Ms. B█████ detailed an incident where Mother chased S.K. around the backseat of the minivan; she appeared at a visit between S.K. and his grandmother, claiming she didn't know he was present, although she had been told about the visit earlier in the day; she called Ms. B█████ when she was instructed not to do so; and she left one of S.K.'s medical appointments to tend to her dogs. During the course of S.K.'s adjudication, Mother was unable to maintain stable housing. Mother often selected housing that was inappropriate for reunification purposes. Mother often moves from location to location, prioritizing her dogs over establishing stability.

30

Although she could detail a list of bills to be paid, she was unable to establish an income. She seeks employment doing jobs she cannot maintain considering her self-described physical limitations. Mother also, at times, acts erratically, evidenced before the Court during her frequent disruptive behavior and interruptions during the proceedings, such as her outbursts of laughter and covering her face with papers during witnesses' responses to questions by counsel. Mother continues to focus on determinations that have already been made, questioning witnesses on statements they made nearly a year before and spending approximately forty-five minutes at the termination hearing retelling the story of the day S.K. was removed from her care by the police. Mother simply is not capable of directing her efforts on obtaining stable, appropriate housing; stable, consistent employment; or treating her physical and mental health concerns. Mother continues to attempt to justify abandoning S.K. with a stranger, rather than acknowledging the potential safety risk such conduct created. At no point during S.K.'s adjudication has she made substantial progress toward alleviating the circumstances that necessitated placement. The continuing concerns related to Mother's behavior and lack of stability have led Mother's visits to remain partially supervised, even after more than a year-and-a-half of Agency involvement.

Despite Mother's protestations that she does not have any mental health concerns, her current counselor has labeled Mother with adjustment disorder and attention deficit disorder by history. According to Ms. Hill, Mother's attention deficit disorder is exacerbated in periods of stress, though she does well when she has stable housing and a functioning vehicle. Mother is inconsistent in treating her mental health. In periods of stress, particularly "around the

31

holidays" when Ms. Hill indicated Mother started to decline, Mother should seek additional treatment or at least meet treatment recommendations. Ms. Hill described Mother's participation in counseling since September or October 2014 as "sporadic."

Also, assuming, *arguendo*, Mother is prescribed Adderall for her diagnosis, she does not take it consistently; nine of the thirty-six successful attempts to test were negative for amphetamines. Conversely, assuming she does not have a prescription, she is often taking a medication she is not supposed to consume. Mother refused to take tests for a period of time between October 17, 2014 and February 20, 2015. She declines to take other medications for her mental health reportedly prescribed. She self-medicates with marijuana. Ms. Hill credibly testified that Mother also continues to need counseling services and Mother could benefit from having the services provided by an in-home team, who could be with her to assist in the implementation of coping skills in Mother's everyday life. This testimony suggests Mother lacks the ability to exercise appropriate coping skills in her everyday life.

Mother obviously connected with Ms. Nulph, and would make most appointments or communicate her absence, but she was not willing to fully cooperate with the service designed to assist Mother in the reunification effort. Mother, for example, did not disclose her termination from the crab shack, although she had been terminated at the time of the meeting. Mother decides what information Mother would like to provide. She does not provide documentation requested; for example, Ms. Egbert did request a copy of Mother's Adderall prescription. Mother has never provided Ms. Egbert with a copy of that prescription. Ms. Nulph never received proof of Mother's employment.

32

Because of the sheer lack of sustained progress in the past year-and-a-half, the Court cannot determine that Mother can or will remedy the conditions that render her incapable of providing S.K. with the essential parental care and subsistence that he requires. Mother does not have the stability necessary to alleviate the stressors that exacerbate her disorder and the Court cannot, from the credible evidence presented, speculate as to when Mother may have enough stability to render her capable of independently providing S.K. with the care he needs.

Therefore, based on the credible evidence presented, the Court finds that termination of Mother's parental rights pursuant to Section 2511(a)(2) is appropriate. A detailed discussion of Section 2511(b) appears herein.

### Section 2511(a)(5)

S.K. has undeniably been in placement in excess of six months. S.K. was adjudicated dependent on August 20, 2013; the termination petition was filed December 16, 2014, at which time S.K. was in placement for approximately sixteen months. At the time the hearing occurred on the petition related to Mother, S.K. had been in placement for approximately eighteen months. Both sixteen and eighteen are greater than six.

S.K. was removed from Mother's care and initially put in placement on an emergency basis due to a safety concern. Mother was hospitalized pursuant to a 302 hold after an incident where Mother left S.K. with a stranger while she took another person's injured dog to receive veterinary care. S.K. was placed in foster care at the time of his adjudication because Mother was not a resource at the time of the adjudication, due to concerns regarding Mother's mental health, instability, particularly in the areas of housing and employment, and drug use. Those

33

concerns have not been alleviated and cannot be remedied within a reasonable period of time.

Concerns regarding Mother's mental health continue to exist. Ms. Hill testified that individuals with severe ADD and ADHD are impulsive, make snap judgments, and have difficulty processing information and prioritizing tasks. Additionally, Ms. Hill testified that an individual with ADHD has "horrendous" time management skills, because they are prone to misjudge how much time something will take. Both Ms. Hill and this Court have seen Mother demonstrate those very behaviors. Mother appears late to hearings and to visits. Furthermore, she consistently indicates that she is working on her time management skills but does not show progress. During the termination proceeding, she disappeared during a ten-minute recess for more than thirty minutes and did not, at that time, explain her absence. To Mother's credit, she does maintain consistent visitation with S.K. She does occasionally miss a visit, or appear after the visit was scheduled to begin, but she does see S.K. or speak to him on the telephone on a rather regular basis.

Mother also has difficulty controlling her behavior, particularly, as pointed out by Ms. Hill, during periods of stress. During periods of stabilization, Ms. Hill testified, "when she got her apartment, the car was running well," Mother was doing well. However, when stress increased, her symptoms increased and "it kind of went down from there." Mother still has not remedied many of the concerns that cause her stress and, at a time when she should be consistent in attending counseling sessions, she has been communicating with Ms. Hill only intermittently. Ms. Hill stated that in September or October the sessions were moved to bi-weekly, but then Ms. Hill described Mother's participation in sessions to be "sporadic."

34

Because Mother has not adequately been addressing either her mental health concerns or the other conditions that necessitated placement, safety concerns still exist. Mother continues to be unable to identify the potential danger caused by her actions when she acts impulsively during periods of stress. Furthermore, Mother's chosen counselor believes Mother has an ongoing need for services and an ongoing need for counseling. Ms. Hill testified she could see the added benefit of Justice Works, because that service assisted Mother in using coping skills and tools in her daily life.

Although she asserts she provided a copy of her prescription for Adderall to her former counsel, Mother has never provided the Agency with a copy of her prescription. Furthermore, assuming she does maintain a valid prescription, she is not consistent with taking the medication. Although many of her drug tests were positive for the component of Adderall revealed by the test, some tests were negative. Although she was prescribed other medication for her mental health, she declines to take other medication.

At this time, Mother cannot provide S.K. with stable housing suitable for reunification and whether she could do so within a reasonable amount of time is unclear. Early on, around the time of the adjudication, Mother did reside in a hotel room at the Midway Hotel from August 20, 2013 until December 12, 2013 that the Agency deemed as suitable for reunification purposes. Unfortunately, Mother did not remain there long enough to achieve reunification. She has been in-and-out of a number of hotels and friends' homes for most of the months S.K. has been in placement. She did obtain an apartment in Dallastown from July 2014 until sometime after the 2015 calendar year began that the Agency deemed acceptable;

35

however, Mother was persistent that the apartment was unacceptable and tried to enter into the record a number of complaints about its condition. Mother no longer remains in Dallastown, having moved into York City in January or February of 2015. The sizeable tax return Mother received in 2014 could have been used to secure stable housing, but, in addition to paying child support, fines, and tow costs, Mother instead paid three payments to a hotel, $1,000.00 to "[her] lawyer,"[4] and paid her friend $1,000.00 for caring for her dogs. Whether Mother's new residence in the city is, in fact, appropriate is unknown, as the Agency did not receive notice of its address until Mother appeared at the March 12, 2015 hearing. She also does not intend on staying at this address, as she advised this Court, when no question was posed, that her ██ ██ Street apartment is neither appropriate nor big enough for S██ and that she obtained this housing because it was an "emergency situation."

Mother has been unable to obtain and maintain employment for any extended period of time; most of her employment is in the food service industry and she has not lasted more than a few weeks at any of these positions. She reported employment at restaurants throughout York County, and some of those jobs were verified by the caseworker, but she never worked at any of those jobs for any significant, consistent period of time and she failed to provide more than two legal paystubs since S.K. was adjudicated. She has only sought legal employment that seems physically challenging for her to do, considering the varicose veins and pain she reports in her leg, and therefore unlikely she can maintain. She claims not to know why she is terminated from positions.

---

[4] It is unclear to the Court what lawyer Mother had to pay. Attorney Woodward was court-appointed and paid by the County.

36

Mother testified that she receives income from performing some form of spiritual work, but the only time Mother has provided receipts from payment was in January 2014. Whether she earns sufficient income from this work and how often she does this work is unknown. Her affidavit does not reveal sufficient information for this Court to conclude that Mother has stable employment or that she has achieved this goal.

Drug use, namely Mother's use of marijuana, continues to be an issue. Although there were only a few positive tests prior to September 2014, she tested positively twice since she resumed taking the tests in February. There was a significant period of time when Mother refused to test for several months until she got the transcripts she wanted. Mother testified that she consumes marijuana to relieve pain, and the presentation of the testimony suggested Mother sees no issue with using illicit drugs to self-medicate. The Court therefore cannot determine Mother's use of drugs is no longer a concern.

Services or the assistance of the Agency will not assist Mother in remedying these concerns within a reasonable period of time. Mother has been provided with services, but instead, preferring to work independently, did not utilize those services in a way that made them effective. Mother likes to choose what she works on, when she participates, and what that participation looks like. When the Justice Works team terminated services in September 2014, after nearly a year of providing assistance, Mother had not made substantial progress toward achieving many of the goals set forth for her. There is no indication to the Court that if a Justice Works team was assigned to work with Mother at this point in time that the circumstances would change.

37

It would take Mother several months to achieve and maintain stability. S.K. has already been in care for approximately half of his young life. To continue to make him wait for a sustained period of stability is contrary to his interests, as Mother wants to be independent and wants to achieve her goals on her own time. Mother has continuously asserted that time management is something she is working on, but she has not demonstrated any progress: she appeared tardy to all of the termination proceedings and disappeared during a ten-minute recess for more than thirty minutes. She appears tardy to visits with S.K. This matter has reached a point where the Court is unable and unwilling to continue to make S.K. wait for Mother to achieve stability.

The termination of Mother's parental rights best serves S.K.'s needs and welfare. While Mother has continued to associate with S.K. consistently throughout S.K.'s adjudication of dependency, S.K.'s daily needs have been met by his foster mother. Although Mother has expressed concerns for the child's care in Ms. B████' home due to fluoride in the water and S.K. wearing socks she believed restricted his circulation, Mother in fact admits that S.K. is where he was supposed to be.[5] Ms. B████ provided credible testimony that S.K. is thriving in her care; he has blossomed from being rather timid to an outgoing, intelligent little boy. He can give Ms. B████ directions back to the residence he considers his home. Additional consideration as to whether termination is in S.K.'s best interest is detailed in Section 2511(b).

---

[5] At the hearing, Mother stated, "…because I knew you were a person of God and I knew that my son was exactly where he was supposed to be." The "you" Mother was referring to was Ms. B████

38

## Section 2511(a)(8)

Indisputably, S.K. has been in placement in excess of twelve months. From the time of S.K.'s adjudication on August 20, 2013 until the time the petition on December 16, 2014, S.K. was in placement for approximately sixteen months. Sixteen months is four months greater than the twelve-month requirement established in Section 2511(a)(8).

S.K. was removed from Mother's care and initially put in placement on an emergency basis due to a safety concern. Mother was hospitalized pursuant to a 302 hold after an incident where Mother left S.K. with a stranger while she took an injured dog to receive veterinary care. S.K. was placed in foster care at the time of his adjudication because Mother was not a resource at the time of the adjudication, due to concerns regarding Mother's mental health; instability, particularly in the areas of housing and employment; and drug use. Although she may have at times made progress toward some of her goals or has been mostly compliant with services provided, all of the concerns that necessitated placement have not been alleviated and the placement of S.K. continues to be necessary.

Concerns regarding Mother's mental health continue to exist. Ms. Hill testified that individuals with severe ADD and ADHD are impulsive, make snap judgments, and have difficulty processing information and prioritizing tasks. Additionally, Ms. Hill testified that an individual with ADHD has "horrendous" time management skills, because they are prone to misjudge how much time something will take. Both Ms. Hill and this Court have seen Mother demonstrate those very behaviors. Mother appears late to hearings and to visits; she consistently indicates that she is working on her time management skills but does not show

39

progress. To Mother's credit, she does maintain consistent visitation with S.K. She does occasionally miss a visit, or appear after the visit was scheduled to begin, but she does see S.K. or speak to him on the telephone on a rather regular basis.

Mother also has difficulty controlling her behavior, particularly, as pointed out by Ms. Hill, during periods of stress. During periods of stabilization, Ms. Hill testified, "when she got her apartment, the car was running well," Mother was doing well. When stress increased, however, her symptoms increased and "it kind of went down from there." Mother still has not remedied many of the concerns that cause her stress and, at a time when she should be consistent in attending counseling sessions, she has been communicating with Ms. Hill only intermittently. Ms. Hill stated that in September or October the sessions were moved to bi-weekly, but then Ms. Hill described Mother's participation in sessions after that alteration to be "sporadic." Because Mother has not adequately been addressing either her mental health concerns or the other conditions that necessitated placement, safety concerns still exist. Mother continues to be unable to identify the potential danger caused by her actions when she acts impulsively during periods of stress. Furthermore, Mother's chosen counselor believes Mother has an ongoing need for services, specifically Justice Works, and an ongoing need for counseling.

Although she asserts she provided a copy of her prescription for Adderall to her former counsel, Mother has never provided the Agency with a copy of her prescription. Furthermore, assuming she does maintain a valid prescription, she is not consistent with taking the medication. Although many of her drug tests were positive for the component of

40

Adderall revealed by the test, some tests were negative. Although she was prescribed other medication for her mental health, she declines to take other medication.

At the time of the petition, Mother did have what appeared to be stable housing appropriate for reunification. She did obtain the apartment in Dallastown from July 2014 and remained there at the time of the filing of the petition in December 2014. The Agency deemed this apartment appropriate, although there were some "cosmetic" problems. Though the home was deemed appropriate, Mother moved again subsequent to the petition being filed. Mother insisted prior to the Status Hearing Order being entered on March 12, 2015, however, that the Dallastown apartment was unacceptable and tried to enter into the record a number of complaints about its condition. Mother seems to want the Court to believe she did not achieve this goal.

Although the Court is not to consider efforts to remedy the circumstances made after the termination, the Court does note that Mother no longer remains at the Dallastown address, as she departed that apartment in early 2015. Whether Mother's new residence in the city is, in fact, appropriate is unknown, as the Agency did not receive notice of its address until Mother appeared at the March 12, 2015 hearing. She also does not intend on staying at this address, as she advised this Court, when no question was posed, that her ⬛⬛ Street apartment is neither appropriate nor big enough for S⬛ and that she obtained this housing because it was an "emergency situation."

Mother has also been unable to obtain and maintain employment for any extended period of time; most of her employment is in the food service industry and she has not lasted

41

more than a few weeks at any of these positions. She reported employment at restaurants throughout York County, and some of those jobs were verified by the caseworker, but she never worked at any of those jobs for any significant, consistent period of time and she failed to provide more than two legal paystubs in the year prior to the termination petition being filed. She has only sought legal employment that seems physically challenging for her to do, considering the varicose veins and pain she reports in her leg, and therefore unlikely she can maintain. She claims not to know why she is terminated from positions.

Mother testified that she receives income from performing some form of "spiritual work," but the only time Mother has provided receipts from payment was in January 2014. Whether she earns sufficient income from this work and how often she does this work is unknown. She provided a signed "affidavit" in mid-December declaring her intent to file as a self-employed individual, but her declared intent to do something is speculative at this point. She has not demonstrated, or has not at least been willing to demonstrate, stable employment. Her "affidavit" does not reveal sufficient information for this Court to conclude that Mother has stable employment or that she has achieved this goal.

Drug use, namely Mother's use of marijuana, continues to be an issue. Although there were only a few positive tests prior to September 2014, Mother then began refusing to participate in the testing until she got the transcripts she wanted. The Court therefore cannot determine Mother's use of drugs is no longer a concern, because Mother chose not to comply with drug testing as directed until February 2015.

Lastly, the termination of Mother's parental rights best serves S.K.'s needs and

42

welfare. While Mother has continued to associate with S.K. consistently throughout S.K.'s adjudication of dependency, S.K.'s daily needs have been met by his foster mother. Ms. B██████ is the individual who makes medical appointments for S.K. and, although Mother does sometimes attend those appointments, it is Ms. B█████ that takes him. Despite Mother's complaints about fluoride and socks, no concerns about S.K.'s safety in Ms. B█████' care have been found. Mother admits that S.K. is where he was supposed to be.[6] Ms. B█████ provided credible testimony that S.K. is thriving in her care; he has blossomed from being rather timid to an outgoing, intelligent little boy. He can give Ms. B█████ directions back to the residence he considers his home. Additional consideration as to whether termination is in S.K.'s best interest is detailed in Section 2511(b).

## Section 2511(b)[7]

Neither expert testimony nor a formal bonding assessment is required for consideration under this subsection of the Adoption Act. See *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). The Court can consider the testimony that was presented by caseworkers and other witnesses in making the determination whether termination would best suit S.K.'s developmental, physical, and emotional welfare. See generally *id.*

Mother's own feelings of love and affection for S.K. do not prevent termination of her parental rights. See *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations

---

[6] At the hearing, Mother stated, "…because I knew you were a person of God and I knew that my son was exactly where he was supposed to be." The "you" Mother was referring to was Ms. B█████.

[7] Any facts as they relate to Mother's attempts to remedy conditions after the filing of the petition in October 2014 were considered only as this section relates to Section 2511(a)(2) and (a)(5). In accordance with the directives in Section 2511(b), facts related to Mother's efforts after the filing were not considered as this section relates to Section 2511(a)(8).

43

omitted). Moreover, the mere existence of a bond, if the Court did find credible evidence supported such a finding, does not preclude termination. See *In re N.A.M.*, 33 A.3d at 103. Because the Court did not find Mother to be a credible witness, there was not significant credible evidence presented regarding Mother's interactions with S.K. The Court therefore finds it difficult to consider the love, comfort, security, and closeness S.K. feels to Mother.

Rather, according to Mother, S.K. is always testing boundaries when he's with her. Additionally, the credible evidence presented to the Court indicates that, although he is typically fine during the visit and interacts with Mother when she is present, S.K. is sometimes reluctant to attend visits with Mother and is always ready to head home when the visit ends. He provides Ms. B█████ with the directions back to what he considers to be his home and gets upset if she tries to go another way. Although Mother believes Ms. B█████ is the one hanging up the phone, it is S.K. that hangs up on Mother when the phone calls near the five-minute mark.

The Superior Court has stated that "no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated." *In re K.H.B.*, 107 A.3d 175, 180 (Pa.Super. 2014)(citing *In re K.Z.S.*, 946 A.3d 753, 764 (Pa.Super. 2008)). By the time the termination petition was filed in December 2014, S.K. was three years old; he had been in placement with Ms. B█████ since he was approximately twenty months old. He has been with Ms. B█████ for nearly half of his life and likely for the entirety of the life he remembers. Ms. B█████ is the individual who cares for S.K. on a daily basis and ensures he receives medical

care on both a routine and emergency basis. S.K. looks to Ms. B████for safety and security. When S.K. first came into Ms. B████ care, he was easily frightened by visitors; this is no longer the case. Ms. B████ has provided S.K. with the safe, stable environment Mother has not demonstrated she has the ability to offer him. He refers to Ms. B████ always with variations of "Mommy," but sometimes refers to Mother as just "A████." Furthermore, Ms. B████ facilitates ongoing contact between S.K. and his maternal grandmother, a opportunity he is not afforded by his mother.

As the Court has found credible evidence exists to support termination of Mother's rights pursuant to both Section 2511(a) and Section 2511(b), the Court does GRANT the petition filed by the Agency.

## CONCLUSIONS OF LAW

1. The Agency has failed to establish by clear and convincing evidence that Mother has either demonstrated a settled purpose to relinquish her parental rights or has failed to perform parental duties on behalf of S.K. for at least six months prior to the filing of the petition. *23 Pa. C.S. § 2511(a)(1).*

2. The Agency has established by clear and convincing evidence that the incapacity, neglect and refusal of Mother has caused S.K. to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, neglect and refusal cannot or will not be remedied by Mother. *23 Pa. C.S. § 2511(a)(2).*

3. The Agency has established by clear and convincing evidence that S.K. was removed

45

from the care of Mother for a period in excess of six (6) months and ha

placement. The circumstances which led to S.K.'s placement con

Mother cannot or will not remedy these conditions within a reasonable

the services or assistance available to Mother are not likely to rem

within a reasonable period of time. Furthermore, the termination of p

S.K.'s best interest. *23 Pa. C.S. § 2511(a)(5).*

4. The Agency has established by clear and convincing evidence that ;

from Mother's custody more than twelve months prior to the filing

petition and that the circumstances that necessitated placement (

Furthermore, the termination of parental rights is in S.K.

*23 Pa. C.S. § 2511(a)(8).*

5. Termination of Mother's parental rights will best serve S.K.'s ne

*23 Pa. C.S. § 2511(a)(5); 23 Pa. C.S. § 2511(a)(8); 23 Pa. C.S. § 2511(l*

Dated: 5/8/15

BY THE COURT,

ANDREA MARCECA STRC

46